**Stella COLLAZOS, Claimant–Appellant,**

**Contents of Account Number 68108021 Held in the Name of Stella Collazos Located at Prudential Securities, Inc., 199 Water Street, New York, New York, 10292, Defendant–in–Rem,**

v.

**UNITED STATES, Plaintiff–Appellee.**

**No. 02–6324.**

United States Court of Appeals, Second Circuit.

Argued: Sept. 25, 2003.

Decided: May 18, 2004.

---

directly involved with the committees, but approved or disapproved the choices made by them.

Joel M. Wolosky, Bondy & Schloss LLP, New York, New York, for Claimant–Appellant.

Jane A. Levine, Assistant United States Attorney, Southern District of New York, New York, New York (James B. Comey, United States Attorney; Gary Stein, Assistant United States Attorney, on the brief), for Plaintiff–Appellee.

Before: MESKILL, KATZMANN, and RAGGI, Circuit Judges.

Judge KATZMANN concurs in the majority opinion, and files a separate concurring opinion.

RAGGI, Circuit Judge.

This case presents us with the first opportunity to interpret the disentitlement provision of the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), Pub.L. No. 106–185, § 14, 114 Stat. 202, 219 (2000), codified at 28 U.S.C. § 2466.

Stella Collazos is a Colombian national indicted in federal and state courts for her alleged operation of a multi-million dollar money-laundering enterprise. In 1996, law enforcement authorities seized $1.1 million from account number 68108021 in Ms. Collazos's name at Prudential Securities, Inc., in New York (the "Prudential Account"), alleging that these monies were related to Ms. Collazos's criminal activities. Ms. Collazos now appeals from a judgment of the United States District Court for the Southern District of New York (John E. Sprizzo, *Judge*), entered October 25, 2002, which dismissed her claim to the seized monies pursuant to 28 U.S.C. § 2466 based on Ms. Collazos's refusal to enter the United States to face the related criminal charges. *See United States v. Contents of Account Number 68108021*, 228 F.Supp.2d 436 (S.D.N.Y. 2002). Ms. Collazos challenges this judgment on three grounds: (1) the disentitlement provision of § 2466 should not have been applied to her case because she is not a fugitive as that term is understood at common law; (2) dismissal of her claim pursuant to § 2466 deprived her of property without due process of law; and (3) retroactive application of § 2466 to the 1996 seizure of her Prudential Account further violated due process.

We conclude that none of these arguments has merit. First, as the plain language of § 2466 indicates, the statute permits disentitlement of a civil forfeiture claimant who has never been in the United States if, upon notice or knowledge of an outstanding criminal warrant for his arrest, the person "declines to enter" the United States or "otherwise evades the jurisdiction of the court" in which the criminal proceeding is pending in order to avoid prosecution. 28 U.S.C. § 2466(a)(1)(B), (C). Second, application of § 2466 to Ms. Collazos did not deprive her of due process with respect to the seized money; rather, she waived her right to be heard in the civil case when she refused to submit to state and federal jurisdiction in related criminal cases. Finally, § 2466 was not applied retroactively to Ms. Collazos because her refusal to enter the United States continued after CAFRA's enactment. Accordingly, we affirm the district court's judgment.

I. *Factual Background*

A. *The Seizure of the Prudential Account*

On March 23, 1999, the United States commenced this *in rem* forfeiture action

against the $1.1 million contents of Ms. Collazos's Prudential Account on the grounds that the funds were the proceeds of illegal narcotics activity, *see* 21 U.S.C. § 881(a)(6), or were property involved in, or traceable to property involved in, a violation of the money-laundering statutes, *see* 18 U.S.C. §§ 981(a)(1)(A), 1956(a).

In its complaint, the government detailed events leading to the initial seizure of the defendant Prudential Account on June 10, 1996. The previous month, on May 1, 1996, Texas state authorities had searched the Houston office of UFF Exchange and Giros Inc. ("UFF"), a money-remitting business owned on paper by Alba Marina Arias but owned in fact by Stella Collazos, who supervised its operation from her home in Cali, Colombia.[1] Papers seized pursuant to the Texas search revealed that UFF routinely deposited money in Houston bank accounts on behalf of fictitious individuals and then wired those funds to nominee or fictitious accounts at BankAtlantic in Miami, Florida. In the sixteen months between January 1995 and April 1996, UFF wire transferred approximately $4.5 million, or about 95% of its total wire volume, from such Texas bank accounts to BankAtlantic. Mindful that such a pattern of money laundering is frequently employed by drug traffickers, Texas authorities had previously analyzed some of the actual currency deposited by UFF and obtained positive test results for cocaine.

In the weeks immediately following execution of the search warrant, a federal court-ordered wiretap intercepted numerous telephonic and facsimile communications between Ms. Collazos and Blanca Piedad Ortiz, a BankAtlantic manager who was subsequently convicted for her role in the laundering scheme, about the need to change names on various accounts listed to fictitious owners. In one such conversation, Ms. Collazos and Ms. Ortiz spoke about the need to move funds from certain nominee accounts to a BankAtlantic account in the name of Javier Rojas. They further discussed the need to dissociate Ms. Collazos's husband, Victor, from the nominee accounts.

Soon thereafter, on May 31, 1996, arrangements were made through the London office of Prudential Securities to open an account in Ms. Collazos's name in New York. That same day, Alba Marina Arias instructed Ms. Ortiz to wire $650,000 from BankAtlantic accounts in the names of Javier Rojas and Victor Collazos to Ms. Collazos's new Prudential Account. Over the next week, an additional $450,000 was transferred to the Prudential Account from bank accounts linked to another money-remitting business owned and operated by Ms. Collazos, Stella Giros Al Minuto ("Stella Giros"). Wire transfers showed that Stella Giros, like UFF, had wired millions of dollars to nominee accounts at Bank Atlantic in 1995–96.

Within days of these transfers, on June 5, 1996, federal authorities concluded a year-long investigation into money laundering out of BankAtlantic accounts by arresting Ms. Ortiz and freezing 1100 Ban-

---

1. A money-remitting business accepts currency from customers and, for a fee, transfers the money through various banks to the customers' designated beneficiaries, often in foreign countries. *See generally United States v. Dinero Express, Inc.*, 313 F.3d 803, 805 (2d Cir. 2002). At the time of the UFF search, Texas law required money-remitting businesses to be licensed pursuant to provisions of the Cur-

rency Exchange Act of the Texas Banking Code, now recodified in the Texas Finance Code. *See* Tex. Civ.Code Ann. § 350 (Vernon 1996) (recodified as Tex. Fin.Code § 153.101–.117, .401).

In 1999, Ms. Arias pleaded "no contest" and was found guilty by a Texas state court on two felony counts of falsely representing herself to be the owner of UFF.

kAtlantic accounts supervised by her. *See generally Coronado v. BankAtlantic Bancorp., Inc.*, 222 F.3d 1315, 1317–18 (11th Cir.2000) (detailing history of the investigation). On June 10, 1996, the New York City Criminal Court issued a warrant for the seizure of Ms. Collazos's Prudential Account. By order dated September 24, 1996, the city court directed that the $1.1 million contents of the Prudential Account be turned over to the United States Customs Service for forfeiture. Ms. Collazos was notified of this fact by letter dated October 23, 1996, and on December 12, 1996, she filed a cash bond and requested that the case be referred for judicial forfeiture. *See* 19 U.S.C. § 1608; 19 C.F.R. § 162.47; 21 C.F.R. § 1316.76.

B. *The Federal Forfeiture Proceedings—Ms. Collazos's Refusal to Appear for Deposition*

For reasons not apparent on the record before us, the federal forfeiture proceedings here at issue were not commenced until March 23, 1999. In the interim, on July 17, 1998, a Texas grand jury returned a sealed indictment charging Ms. Collazos with unlawfully engaging in the business of currency transmission without a license, a state felony crime. Eight days after the filing of the forfeiture complaint, on March 31, 1999, Ms. Collazos, through counsel, filed a claim to the subject funds, and on April 23, 1999, she formally answered the complaint, generally denying the allegations of criminal activity and asserting, *inter alia*, that she was an innocent owner of the seized money. *See, e.g., United States v. All Assets of G.P.S. Automotive Corp.*, 66 F.3d 483, 487–88 (2d Cir.1995) (discussing innocent-owner provision of former 18 U.S.C. § 981(a)(2)).

The United States noticed Ms. Collazos's deposition for May 1999, but she declined to appear at that time, prompting a series of adjournments. Correspondence between the parties reveals that Ms. Collazos sought to avoid deposition in the United States lest she be arrested on the pending Texas criminal charge. On October 6,2000, the district court entered an order requiring the parties to complete discovery by January 4, 2001, specifically directing Ms. Collazos to appear for deposition in the United States on or before that date or face an order of default or dismissal in the case. This order was vacated on November 15, 2000, and a new order entered adhering to the January 4, 2001 discovery deadline but stating that the penalty for Ms. Collazos's failure to appear for deposition by that date would be the entry of "an appropriate preclusion order." Ms. Collazos did not appear for deposition as directed in January 2001. On June 5, 2001, the district court set the case down for trial on September 25, 2001.

C. *The Federal Indictment and Criminal Trial*

A few days earlier, on June 1, 2001, a federal grand jury sitting in the Southern District of Florida returned a sealed indictment charging Ms. Collazos, Ms. Ortiz, and Lucia Ramirez, an assistant to Ms. Ortiz at BankAtlantic, with conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h). The indictment also sought criminal forfeiture pursuant to 18 U.S.C. § 982(a)(1) of $144,281,503, the total amount allegedly laundered during the conspiracy. The indictment specifically noted that this amount "includes but is not limited to the contents of Account No. 68108[0]21 held in the name of Stella Collazos located at Prudential Securities, Inc.," i.e., the $1.1 million then at issue in the New York civil forfeiture proceeding. *United States v. Ortiz*, No. 01–0539 (S.D.Fla. Jun. 1, 2001) (Indictment). The Florida indictment was unsealed on August 13, 2001, and the following day, gov-

ernment counsel in the New York action sought and eventually obtained a stay of the civil forfeiture trial to permit the filing of a motion pursuant to 28 U.S.C. § 2466 to dismiss Ms. Collazos's claim.

In October 2001, an attorney purporting to act for Ms. Collazos contacted the prosecutor in the Southern District of Florida and inquired whether the government would consent to Ms. Collazos's pre-trial release if she voluntarily surrendered in the criminal case. The prosecutor declined to consent to the proposal, and Ms. Collazos did not appear in the United States when trial commenced on December 6, 2001. Two weeks later, on December 19, 2001, Ms. Ortiz was found guilty and subsequently sentenced to 240 months' incarceration.

In proving the conspiracy against Ms. Ortiz, the prosecution adduced considerable evidence inculpating Ms. Collazos. The district court cited excerpts from the Ortiz trial transcript in its ruling in this case. For example, Rubin Dario Roascos–Mendez, a former employee of Ms. Collazos, testified to the different commissions charged by her to launder money. *See United States v. Contents of Account Number 68108021*, 228 F.Supp.2d at 441. Lucia Ramirez, who had pleaded guilty before trial pursuant to a plea agreement, testified that on or about May 31, 1996, she wired $657,000 out of BankAtlantic accounts controlled by Ms. Collazos to Europe, then back to BankAtlantic, and then to New York in order to help conceal the money and to avoid its seizure by investigators. *Id.* at 442. Based on its overall review of the Ortiz trial, the district court found that the evidence demonstrated "that Collazos laundered narcotics proceeds through her money remitting businesses and through accounts she and Piedad Ortiz managed at BankAtlantic. Furthermore, it is clear that the defen-

dant-in-rem funds are directly traceable to that same money laundering scheme." *Id.*

D. *The § 2466 Dismissal of Ms. Collazos's Claim in the Forfeiture Action*

On December 5, 2001, the day prior to the start of the Ortiz criminal trial, the government moved to dismiss Ms. Collazos's claim in the civil forfeiture action on the ground that as a person who refused to enter the United States to answer pending criminal charges, she was not entitled to be heard in a related civil proceeding. *See* 28 U.S.C. § 2466. After extensive briefing, evidentiary submissions, and oral argument, the district court granted the government's motion in its Memorandum Opinion and Order dated October 25, 2002. *See United States v. Contents of Account Number 68108021*, 228 F.Supp.2d 436. This timely appeal followed.

II. *Discussion*

A. *Title 28 U.S.C. § 2466 Properly Applies to Ms. Collazos*

1. *Ms. Collazos's Claim that She Is Not a "Fugitive"*

■ Ms. Collazos asserts that 28 U.S.C. § 2466, which is entitled "Fugitive disentitlement," cannot be applied to her because she is not a "fugitive" as that term is understood at common law. We review the legal applicability of § 2466 to Ms. Collazos's forfeiture claim *de novo;* to the extent we conclude that the statute is applicable to her situation, we review the district court's decision to order disentitlement for abuse of discretion. *See generally Organic Cow, LLC v. Center for New England Dairy Compact Research*, 335 F.3d 66, 71 (2d Cir.2003); *United States v. Morgan*, 254 F.3d 424, 426 (2d Cir.2001).

In support of her argument, Ms. Collazos cites *Empire Blue Cross & Blue Shield*

*v. Finkelstein,* 111 F.3d 278 (2d Cir.1997), wherein this court recognized that "[a] fugitive from justice has been defined as '[a] person who, having committed a crime, flees from [the] jurisdiction of [the] court where [a] crime was committed or departs from his usual place of abode and conceals himself within the district.' " *Id.* at 281 (quoting *Black's Law Dictionary* 604 (5th ed.1979)). Relying on this common-law definition, Ms. Collazos submits that she cannot be deemed a fugitive because she was not in the United States at the time of the alleged money laundering; indeed, she submits that she was last in the United States in 1977.[2] To the extent the government charges her with directing money-laundering activity in the United States from her home in Colombia, Ms. Collazos asserts that such conduct does not render her a fugitive because, as Justice Holmes observed almost a century ago, although "[a]cts done outside a jurisdiction, but intended to produce and producing detrimental effects within it, justify a state in punishing the cause of the harm as if [the foreign actor] had been present at the effect, . . . it does not follow that [the person] is a fugitive from justice." *Strassheim v. Daily,* 221 U.S. 280, 285, 31 S.Ct. 558, 55 L.Ed. 735 (1911).

▇▇▇▇ Neither *Empire Blue Cross* nor *Strassheim,* nor for that matter any other case cited in Ms. Collazos's briefs, deals with the particular disentitlement statute

here at issue, 28 U.S.C. § 2466.[3] Although § 2466 uses the term "fugitive" in its title, the word is not employed in the text of the provision. Well-established principles of construction dictate that statutory analysis necessarily begins with the "plain meaning" of a law's text and, absent ambiguity, will generally end there. *See, e.g., Lamie v. United States Trustee,* —— U.S. ——, ——, 124 S.Ct. 1023, 1030, 157 L.Ed.2d 1024 (2004); *Park 'N Fly v. Dollar Park & Fly, Inc.,* 469 U.S. 189, 194, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985); *accord United States v. Lucien,* 347 F.3d 45, 51 (2d Cir. 2003). While a title may be a useful "tool[ ] . . . for the resolution of a doubt about the meaning of a statute," *Almendarez–Torres v. United States,* 523 U.S. 224, 234, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998) (internal quotation marks omitted), a "title . . . cannot limit the plain meaning" of unambiguous text, *Pennsylvania Dep't of Corrs. v. Yeskey,* 524 U.S. 206, 212, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998) (internal quotation marks omitted); *accord Drax v. Reno,* 338 F.3d 98, 110 (2d Cir. 2003). This conclusion necessarily pertains to the common-law meaning of a word found only in a statutory title, but not used in the text. *See generally Carter v. United States,* 530 U.S. 255, 264, 120 S.Ct. 2159, 147 L.Ed.2d 203 (2000) ("The canon on imputing common-law meaning applies only when Congress makes use of a

---

**2.** Evidence to the contrary was offered at the Ortiz trial by prosecution witness Monica Gallardo, who testified to meeting Stella Collazos in New Jersey in the early 1990s in connection with Ms. Collazos's efforts to establish a money transmitting business in that state. For purposes of this appeal, we assume *arguendo,* as the district court did in ruling on the § 2466 motion, that Ms. Collazos has not been in the United States since 1977.

**3.** *Strassheim* discussed who qualified as a "fugitive" for purposes of interstate extradition

rather than disentitlement. The concept of a "fugitive" in that context has itself been statutorily modified as states have adopted the Uniform Criminal Extradition Act of 1936, Section 6 of which provides "an exception to the general rule that an accused is not a fugitive from justice and may not be extradited if he was not physically present in the demanding state when the offense was committed." *See* 31A Am.Jur.2d *Extraditions* § 29 (2002) (footnotes omitted).

statutory *term* with established meaning at common law .... " (emphasis in original)).

■ In this case, the text of § 2466 makes plain that statutory disentitlement extends beyond common-law fugitives to encompass persons who may never previously have been in the United States but who know that they are subject to arrest in this country and who, therefore, refuse to enter its jurisdiction in order to avoid prosecution. Before examining the exact language of the statute, however, a brief discussion of the circumstances leading to the enactment of § 2466 is useful.

### 2. *The Judicial Fugitive Disentitlement Doctrine*

The fugitive disentitlement doctrine was originally developed by courts to support dismissal of direct appeals by escaped criminal defendants. As the Supreme Court explained in *Smith v. United States,* 94 U.S. 97, 97, 24 L.Ed. 32 (1876), "[i]t is clearly within our discretion to refuse to hear a criminal case in error, unless the convicted party ... is where he can be made to respond to any judgment we may render." *Accord Molinaro v. New Jersey,* 396 U.S. 365, 366, 90 S.Ct. 498, 24 L.Ed.2d 586 (1970) (escape "disentitles the defendant to call upon the resources of the Court for determination of his claims"); *United States v. Awadalla,* 357 F.3d 243, 245 (2d Cir.2004) (and cases cited therein). Over time, numerous courts, including this one, applied disentitlement to fugitives in civil cases, including forfeiture proceedings, noting "the impropriety of permitting a fugitive to pursue a [civil] claim in federal court where he might accrue a benefit, while at the same time avoiding [a criminal] action of the same court that might sanction him." *United States v. Eng,* 951 F.2d 461, 465 (2d Cir.1991); *see United States v. $45,940 in United States Currency,* 739 F.2d 792, 797–98 (2d Cir.1984); *see*

*also United States v. Timbers Preserve,* 999 F.2d 452, 455 (10th Cir.1993); *United States v. 7707 S.W. 74th Lane,* 868 F.2d 1214, 1216 (11th Cir.1989); *United States v. $129,374 in United States Currency,* 769 F.2d 583, 587 (9th Cir.1985). *But see United States v. $40,877.59 in United States Currency,* 32 F.3d 1151, 1156–57 (7th Cir.1994) (declining to apply disentitlement doctrine in civil forfeiture); *United States v. Pole 3172, Hopkinton,* 852 F.2d 636, 643–44 (1st Cir.1988) (declining to apply doctrine to particular case without ruling on general applicability to civil forfeitures); *United States v. $83,320 in United States Currency,* 682 F.2d 573, 576 (6th Cir.1982) (expressing concern that fugitive disentitlement in civil forfeitures could prevent claims by other interested parties).

### 3. *Degen v. United States Curbs the Courts' Inherent Power to Disentitle Fugitive Claimants in Civil Forfeiture Proceedings*

In *Degen v. United States,* 517 U.S. 820, 116 S.Ct. 1777, 135 L.Ed.2d 102 (1996), the Supreme Court ruled that courts could not impose the "harsh sanction of absolute disentitlement" on fugitives in civil forfeiture cases simply on the basis of their "inherent authority to protect their proceedings and judgments," *id.* at 823, 827. While acknowledging "disquiet at the spectacle of a criminal defendant reposing [abroad], beyond the reach of our criminal courts, while at the same time mailing papers to the court in a related civil action and expecting them to be honored," *id.* at 828, the Court's immediate concern was the "danger of overreaching when one branch of the Government, without benefit of cooperation or correction from the others, undertakes to define its own authority," *id.* at 823. In short, a proper respect for the constitutional separation of powers in-

formed *Degen's* decision to restrict the courts' inherent authority to order disentitlement. In forfeiture cases, where a court's jurisdiction over the property in dispute ensures its ability to enforce a judgment, the Supreme Court concluded that disentitlement was simply too "blunt" a sanction for a court to impose on its own. *Id.* at 828, 116 S.Ct. 1777.

4. *Congress Confers Statutory Authority on the Courts to Order Disentitlement in Civil Forfeiture Cases Reaching Beyond Common–Law Fugitives*

In 2000, in conjunction with a comprehensive revision of civil asset forfeiture laws, Congress specifically conferred statutory authority on federal courts to order disentitlement in civil forfeiture cases. *See* 28 U.S.C. § 2466; *see generally*, Stefan D. Cassella, *The Civil Asset Forfeiture Reform Act of 2000: Expanded Government Forfeiture Authority and Strict Deadlines Imposed on All Parties,* 27 J. Legis. 97 (2001) (providing an overview of changes effected by CAFRA). Section 2466 states, in pertinent part:

(a) A judicial officer may disallow a person from using the resources of the courts of the United States in furtherance of a claim in any related civil forfeiture action or a claim in third party proceedings in any related criminal forfeiture action upon a finding that such person—

(1) after notice or knowledge of the fact that a warrant or process has been issued for his apprehension, in order to avoid criminal prosecution—

(A) purposely leaves the jurisdiction of the United States;

(B) declines to enter or reenter the United States to submit to its jurisdiction; or

(C) otherwise evades the jurisdiction of the court in which a criminal case is pending against the person; and

(2) is not confined or held in custody in any other jurisdiction for commission of criminal conduct in that jurisdiction.

■ By its terms, the statute identifies five prerequisites to disentitlement: (1) a warrant or similar process must have been issued in a criminal case for the claimant's apprehension; (2) the claimant must have had notice or knowledge of the warrant; (3) the criminal case must be related to the forfeiture action; (4) the claimant must not be confined or otherwise held in custody in another jurisdiction; and (5) the claimant must have deliberately avoided prosecution by (A) purposefully leaving the United States, (B) declining to enter or reenter the United States, or (C) otherwise evading the jurisdiction of a court in the United States in which a criminal case is pending against the claimant. Even when these requirements are satisfied, however, § 2466 does not mandate disentitlement; the ultimate decision whether to order disentitlement in a particular case rests in the sound discretion of the district court. *See id.* § 2466(a); *see also* 146 Cong. Rec. S1753–02, *S1761 (Mar. 27, 2000) (statement of Sen. Leahy) (explaining that legislation "provides a statutory basis for a judge to disallow a civil forfeiture claim by a fugitive, while leaving judges discretion to allow such a claim in the interests of justice," and noting that *Degen* "left open the possibility that Congress could establish such [a] doctrine by statute").

The three lettered subparts of the statute's fifth requirement indicate that the statutory disentitlement power conferred by Congress is not limited, as Ms. Collazos urges, to common-law fugitives. Certain-

ly, subpart A targets traditional common-law fugitives, specifically, persons who allegedly committed crimes while in the United States and who, upon learning that their arrest was sought, fled the country. Similarly, the "reenter" provision of subpart B extends disentitlement authority over another class of persons traditionally recognized as "fugitives," that is, persons who allegedly committed crimes while in the United States but who were outside the country—for whatever reason—when they learned that their arrests were sought and who then refused to return to the United States in order to avoid prosecution. *See, e.g., United States v. Eng*, 951 F.2d at 464 ("Fleeing from justice is not always a physical act; it may be a state of mind.... Thus, a defendant with notice of criminal charges who actively resists returning from abroad to face those charges is a fugitive from justice ...."); *United States v. $45,940 in United States Currency*, 739 F.2d at 796–98 (holding that deported Canadian who failed to seek permission from U.S. Consulate to enter United States and answer pending criminal charges was properly deemed a fugitive); *see also Jhirad v. Ferrandina*, 536 F.2d 478, 483 (2d Cir.1976) (holding that no "meaningful distinction exists between those who leave their native country and those who, already outside, decline to return").

But the statute is by no means limited to these two groups. Subpart B also applies to persons who, qualifying in all four other respects for disentitlement, decline to "enter" the United States' jurisdiction. Ms. Collazos conclusorily argues that Congress could not have meant "enter" to pertain to persons who had never previously been in the United States, or even to persons such as herself whose last visit to the United States predated her alleged criminal conduct by many years. This argument, however, ignores the plain language of the two words—"enter or reenter"—employed by Congress in subpart B. *See generally Carey v. Saffold*, 536 U.S. 214, 219, 122 S.Ct. 2134, 153 L.Ed.2d 260 (2002) (looking to "ordinary meaning" of "pending" to interpret tolling provision of 28 U.S.C. § 2244(d)); *Muscarello v. United States*, 524 U.S. 125, 128–32, 118 S.Ct. 1911, 141 L.Ed.2d 111 (1998) (looking to ordinary English usage to discern meaning of "carry" as used in 18 U.S.C. § 924(c)(1)). The terms are not synonymous: to "enter" means to go into a place; to "reenter" means to go into a place *again. See Webster's Third New International Dictionary* 756, 1907 (2002). In short, only "reenter" communicates the limited sense urged by Ms. Collazos: that a forfeiture claimant who had been in the United States at the time of the alleged crime would, thereafter, refuse to return to this country to face charges. Had Congress intended to limit disentitlement to such persons, there would have been no need to refer also to persons who refuse to "enter" the United States.

We are, of course, obliged "to give effect, if possible, to every clause and word of a statute," and to render none superfluous. *Duncan v. Walker*, 533 U.S. 167, 174, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001) (internal quotation marks omitted). Moreover, when, as here, the two words at issue are connected by "or" rather than "and," and when no commas set off the second word to suggest that it stands in apposition to the first, we construe the disjunctive words to convey different meanings. *See United States v. Bernier*, 954 F.2d 818, 819 (2d Cir.1992) (holding that "second or subsequent" in 18 U.S.C. § 924(c) convey different meanings). Thus, we conclude that Congress's use of "enter" as well as "reenter" in subpart B extends disentitlement authority beyond common-law fugitives, who may have been in the United

States at the time they committed the charged crimes and who refuse to return, to persons who, although they may have never set foot within the territorial jurisdiction of the United States, know that warrants are outstanding for them and, as a result, refuse to enter the country.

Our conclusion that § 2466 disentitlement extends beyond traditional common-law fugitives is reinforced by subpart (C) of the statute, which permits courts to disentitle any person who, meeting all four other requirements, "*otherwise evades* the jurisdiction of the court in which a criminal case is pending against the person." 28 U.S.C. § 2466 (emphasis added). "Evasion" is an expansive concept encompassing any "craft or strategem . . . to avoid facing up to something." *Webster's Third New International Dictionary*, at 786. While it is broad enough to include the deliberate flight identified in subpart (A) and the refusal to "enter or reenter" identified in subpart (B), the use of the introductory word "otherwise" indicates that the evasion referred to in subpart (C) reaches beyond these specific examples to myriad means that human ingenuity might devise to permit a person to avoid the jurisdiction of a court where a criminal case is pending against him. Nothing in subpart (C) indicates that a person must have been within the jurisdiction of the court at the time the crime was committed in order thereafter to evade jurisdiction.

As the government notes in its brief, most crimes that give rise to civil forfeiture proceedings can be committed extraterritorially. In addition to the money-laundering crimes charged against Ms. Collazos, examples of such crimes include drug trafficking, *see United States v. Orozco–Prada*, 732 F.2d 1076, 1087–88 (2d Cir.1984) (discussing extraterritorial jurisdiction for violation of 21 U.S.C. § 841(a)(1), an offense for which the appli-cable forfeiture provision is 21 U.S.C. § 881(a)(6)); certain types of wire fraud, *see United States v. Kim*, 246 F.3d 186, 188–91 (2d Cir.2001) (discussing extraterritorial jurisdiction for violation of 18 U.S.C. § 1343, certain violations of which may trigger forfeiture pursuant to 18 U.S.C. § 981(a)(1)(D)); and international terrorism, *see* 18 U.S.C. § 2339C (triggering forfeiture provisions of 18 U.S.C. § 981(a)(1)(H)). Indeed, it was in connection with a terrorist prosecution that we recently had reason to reiterate the principle that "Congress is presumed to intend extraterritorial application of criminal statutes where the nature of the crime does not depend on the locality of the defendants' acts and where restricting the statute to United States territory would severely diminish the statute's effectiveness." *United States v. Yousef*, 327 F.3d 56, 87 (2d Cir.2003). Experience demonstrates that the heads of global criminal networks frequently orchestrate their schemes from foreign safe havens while dispatching subordinates to the United States to handle practical implementation. Given this reality, it is hardly surprising that Congress should have decided not to draw a disentitlement distinction between a crime leader and his subordinate when both seek to avoid prosecution in this country, the former by declining to "enter" the United States for the first time and the latter by declining to "reenter." Either scenario presents the unseemly spectacle recognized by the Supreme Court in *Degen* and by this court in *Eng* of a criminal defendant who, facing both incarceration and forfeiture for his misdeeds, attempts to invoke from a safe distance only so much of a United States court's jurisdiction as might secure him the return of alleged criminal proceeds while carefully shielding himself from the possibility of a penal sanction.

Because Congress has clearly chosen not to limit disentitlement in such civil forfeiture cases to common-law fugitives, we reject Ms. Collazos's argument that § 2466 cannot apply to her as a matter of law.

### 5. *The District Court Did Not Abuse Its Discretion in Ordering Disentitlement*

Ms. Collazos raises no serious challenge to the district court's factual findings in support of its order of disentitlement. Indeed, the record amply supports the conclusion that all five statutory requirements for forfeiture were satisfied in her case. First, it is undisputed that warrants for her arrest were outstanding both on the Texas state banking charge and the Florida federal money-laundering charge. Second, Ms. Collazos was plainly aware of the Texas charge as evidenced by her forfeiture counsel's reference to it as an excuse for her failure to appear for deposition in the summer and fall of 1999. Similarly, her awareness of the Florida charge was evidenced by the unsuccessful efforts of another attorney acting on her behalf in October 2001 to negotiate a surrender that would not involve Ms. Collazos's pre-trial detention. Third, the relationship between the Florida criminal case and the civil forfeiture action could not have been closer: the money transfers to the seized Prudential Account were proved as part of the laundering charge at the criminal trial against co-defendant Ortiz; witnesses at the Ortiz trial testified in some detail to Ms. Collazos's involvement in these transfers and the larger criminal scheme; and the $1.1 million seized from the Prudential Account was specifically identified in the criminal forfeiture count of the Florida indictment. Fourth, nothing in the record indicates that Ms. Collazos was ever confined, incarcerated, or otherwise unable to travel to the United States of her own volition in the months before the district court ordered disentitlement. Finally, the totality of circumstances indicates that Ms. Collazos made a conscious choice not to "enter or reenter the United States" to face the criminal charges pending against her.

Ms. Collazos nevertheless complains that but for the delay by the district court in conducting the trial of her forfeiture case, that civil matter might have been resolved before she qualified for disentitlement under the statute. Any suggestion that the district court thus abused its discretion in handling the issue of disentitlement is meritless. To the extent there was initial delay in scheduling the forfeiture trial, this was a product of Ms. Collazos's repeated failures to appear for deposition, part of her acknowledged efforts to avoid prosecution on the Texas charge. When in August 2001, approximately one month before the scheduled forfeiture trial, the district court was apprised of Ms. Collazos's indictment on the federal charge in Florida, its stay of the forfeiture trial was not, as Ms. Collazos suggests, a maneuver to ensure that she qualified for disentitlement. To the contrary, by waiting until October 2002, more than a year after Ms. Collazos learned of the Florida charges, before ordering disentitlement, the district court plainly afforded her every reasonable opportunity to submit to United States jurisdiction in the related criminal case and to avoid disentitlement pursuant to § 2466. *See Europcar Italia, S.p.A. v. Maiellano Tours, Inc.*, 156 F.3d 310, 316–17 (2d Cir.1998) (and cases cited therein) (recognizing broad district court discretion to stay proceedings as an incident to its power to control its docket).

In sum, we conclude that the district court's order of disentitlement fully comported with § 2466, and involved no abuse of discretion.

B. *Application of § 2466 to Ms. Collazos's Case Did Not Violate Due Process*

■ The Due Process Clause of the Fifth Amendment establishes "the general rule that individuals must receive notice and an opportunity to be heard before the Government deprives them of property." *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 48, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993). The Supreme Court specifically recognized the applicability of this principle to civil forfeiture actions in *Degen v. United States,* noting that "[i]n an ordinary case a citizen has a right to a hearing to contest the forfeiture of his property, a right secured by the Due Process Clause, and implemented by federal rule." 517 U.S. at 822, 116 S.Ct. 1777 (internal citations omitted). *Degen,* however, declined to "intimate a view" on the constitutional issue raised on this appeal by Ms. Collazos: "whether enforcement of a disentitlement rule under proper [statutory] authority would violate due process." *Id.* at 828, 116 S.Ct. 1777. We hold that Ms. Collazos was not deprived of due process by the district court's § 2466 disentitlement order. Rather, we conclude that Ms. Collazos voluntarily waived her right to be heard in the civil forfeiture action by refusing to appear in the related criminal case.

This court first considered the due process implications of disentitlement orders in civil forfeiture cases some twenty years ago in *United States v. $45,940 in United States Currency* and there ruled that a claimant "waived his right to due process in the civil forfeiture proceeding by remaining a fugitive," 739 F.2d at 798. We reiterated this holding in *United States v. Eng,* explaining that a person who refuses to appear in this country for arraignment on criminal charges of which he has notice thereby waives "his due process rights in

related civil forfeiture proceedings," 951 F.2d at 466. Ms. Collazos urges us to reconsider these holdings because the underlying assumption of these two cases— that inherent judicial authority permitted disentitlement in civil forfeiture cases— was implicitly overruled by *Degen.* She submits that two cases cited in *Degen*— *McVeigh v. United States,* 78 U.S. (11 Wall.) 259, 20 L.Ed. 80 (1870), and *Hovey v. Elliott,* 167 U.S. 409, 17 S.Ct. 841, 42 L.Ed. 215 (1897)—support the conclusion that disentitlement in civil forfeiture cases violates due process. We disagree.

*McVeigh* and *Hovey* involved disputes arising out of the Civil War. In *McVeigh,* a former Confederate official filed a writ of error to challenge the United States' confiscation of his property. The district court struck his claim and answer on the grounds that as an enemy alien he had no right to be heard. Reversing, the Supreme Court ruled that every person has the right to be heard in defense by a court when his life or property are in jeopardy: "If assailed there, he could defend there. The liability and the right are inseparable." *McVeigh v. United States,* 78 U.S. at 267, 78 U.S. 259.

*Hovey*'s dispute involved monies awarded for settlement of claims arising from the depradation of the *Alabama* and her sister ships. *See generally* Susan Poser & Elizabeth R. Varon, *United States v. Steinmetz, The Legal Legacy of the Civil War, Revisited,* 46 Ala. L.Rev. 725, 760 n.201 (1995). When defendants disobeyed a court order directing them to deposit $49,297.50 paid them by the receiver into the court registry, the district court held them in contempt, struck their answer in the case, and entered final judgment against them in the full amount sought by claimants, $197,190. *See Hovey v. Elliott,* 167 U.S. at 411–12, 17 S.Ct. 841. The Supreme Court ruled that the power "to

punish for contempt" did not permit a court to strike a party's answer, "suppress the testimony in his favor, and condemn him without consideration thereof, and without a hearing, on the theory that he has been guilty of a contempt of court." *Id.* at 413, 17 S.Ct. 841.

The common principle to be derived from these two cases, as the Supreme Court observed in *Degen,* is that disentitlement may not constitutionally be employed simply "as punishment." *Degen v. United States,* 517 U.S. at 828, 116 S.Ct. 1777. As *Hovey* emphasized, "[t]he fundamental conception of a court of justice is condemnation only after hearing." *Hovey v. Elliott,* 167 U.S. at 413–14, 17 S.Ct. 841. But as then-Justice White, the author of *Hovey,* later explained in *Hammond Packing Co. v. Arkansas,* 212 U.S. 322, 29 S.Ct. 370, 53 L.Ed. 530 (1909), no punishment in violation of due process occurs when a court, pursuant to statutory authority, strikes a party's answer and enters default judgment as a consequence of the party's failure to comply with a court order to produce material evidence in the case: "the striking out of the answer and default was a punishment, but it was only remotely so, as the generating source of the power was the right to create a presumption flowing from the failure to produce," *id.* at 351, 29 S.Ct. 370 (observing that party's failure to produce requested evidence was akin to "an admission of the want of merit in the asserted defense"); *cf. Société Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers,* 357 U.S. 197, 209–10, 212, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958) (noting that *Hovey* "was substantially modified by *Hammond Packing Co.,*" and distinguishing between a party's willful refusal to comply with a pretrial order, which would support dismissal of an action pursuant to Fed.R.Civ.P. 37, and a party's inability to comply, which would not).

Statutory disentitlement pursuant to § 2466 is more akin to the presumptive action approved in *Hammond* than to the punitive measures condemned in *Hovey* and *McVeigh.* Certainly Ms. Collazos, unlike Mr. McVeigh, was not ordered disentitled as punishment for misconduct that predated her civil forfeiture claim. More important, while Mr. McVeigh could not undo his past support for the Confederacy in order to obtain a hearing on his confiscation claim, Ms. Collazos could have secured a hearing on her forfeiture claim any time between August 2001 and October 2002 simply by entering the United States. Neither was Ms. Collazos's disentitlement a punishment for a discrete past act of contempt as in *Hovey.* Her situation might better be analogized to that of a civil contemnor who, for more than a year, knew that she could secure a forfeiture hearing and avoid disentitlement by complying with the statutory requirement that she enter the United States. Only her persistent refusal to comply resulted in the court's dismissing her forfeiture claim. No additional burden was imposed on her that could fairly be characterized as "punishment." *See generally International Union, UMW v. Bagwell,* 512 U.S. 821, 831, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994) (discussing differences between civil and criminal contempt and noting that "[b]ecause civil contempt sanctions are viewed as nonpunitive and avoidable, fewer procedural protections for such sanctions have been required"). In other words, Ms. Collazos was denied a hearing on *her* terms, but a hearing was certainly available to her on the terms established by Congress.

By authorizing § 2466 disentitlement, Congress imposed a presumption in civil forfeiture cases of the sort approved in *Hammond.* Specifically, when persons, such as Ms. Collazos, refuse to enter the United States to face criminal charges, but

simultaneously attempt to challenge related civil forfeitures by asserting innocent-owner defenses, the claimant's deliberate absence from the United States gives rise to a presumption that there is no merit to the innocent-ownership claim. Indeed, in many cases, certainly in Ms. Collazos's, the presumption is reinforced when the claimant's absence deprives the government of the opportunity to conduct a deposition, which itself supports an adverse inference as to the criminal source and use of the seized currency. *See generally United States v. United States Currency in the Amount of $119,984.00, More or Less,* 304 F.3d 165, 176–77 (2d Cir.2002) (noting that an adverse inference may be drawn against a civil forfeiture claimant who invokes his Fifth Amendment right not to testify). Ms. Collazos concedes that an adverse inference could have been drawn from her failure to submit to deposition; nevertheless, she insists that due process only permitted an inference, not disentitlement.[4] But that is not the holding in *Hammond.* There too, the party's failure to produce ordered material could simply have given rise to an adverse trial inference, but the Supreme Court ruled that a legislature acted within its power, and did not deprive a litigant of due process, when it used the adverse inference as a basis for

requiring dismissal of a non-complying party's answer and the entry of a default judgment. For the same reason, we conclude that when persons knowingly refuse to produce themselves in the United States to answer criminal charges, Congress acts within its power and does not violate due process by authorizing courts to disallow their challenges in related civil forfeiture proceedings.

Two additional reasons support our conclusion that § 2466 did not deprive Ms. Collazos of due process: (1) Ms. Collazos was afforded notice and opportunity to be heard on the government's claim that she satisfied the five statutory requirements for § 2466 disentitlement, and (2) § 2466 did not require the district court to order disentitlement.

The first factor ensured that disentitlement in Ms. Collazos's case was consistent with constitutional and statutory procedural guaranties. Thus, Ms. Collazos could have challenged the sufficiency of the government's proof that she knew or had notice that her arrest was sought in the United States, that there was a factual relationship between the pending criminal charges and the forfeiture proceeding, that she was in fact able to come to the United States, or any of the other requirements for disentitlement established by § 2466.

4. Ms. Collazos submits that at a forfeiture trial she would have offered expert accountant opinions that the money seized from the Prudential Accounts could not be traced to criminal activity. It is dubious that such testimony would have sufficed to carry Ms. Collazos's burden. As the district court concluded from its review of the Ortiz trial transcript, considerable direct evidence established that Ms. Collazos "laundered narcotics proceeds" through her remitting business and that "the defendant-in-rem funds are directly traceable to that same money laundering scheme." *United States v. Contents of Account Number 68108021,* 228 F.Supp.2d at 442. Notably, Lucia Ramirez testified to laundering approximately $650,000 as it was transmitted from

BankAtlantic to New York in May 1996 to help Ms. Collazos conceal the money from investigators. Even if the web of preceding transfers was sufficiently complex to preclude an accountant, working only with financial records, from tracing the source of the seized money, the fact remains that Ms. Collazos presumably had personal knowledge of such source, and her failure to submit herself for deposition with respect to this and other points would have supported an adverse inference as to the money's criminal origins. *See generally United States v. 4003–4005 5th Ave.,* 55 F.3d 78, 83 (2d Cir.1995) (noting that civil forfeiture claimant who invokes Fifth Amendment is not freed from obligation to meet his burden of proof).

The second factor permitted Ms. Collazos to present the district court with any facts and circumstances that might indicate that justice was not served by disentitlement in her case.

In sum, because statutory disentitlement is itself preceded by notice and hearing, and because such disentitlement does not impose a punishment but rather creates an adverse presumption that a claimant can defeat by entering an appearance in a related criminal case, we hold that 28 U.S.C. § 2466 does not violate due process by depriving a forfeiture claimant of property without a hearing. Instead, as we ruled in *Eng* and *$45,949*, it is the claimant who knowingly waives that right by deliberately refusing to appear in the related criminal case.

### C. *Section 2466 Was Not Retroactively Applied in Ms. Collazos's Case*

█ Ms. Collazos asserts that she was further deprived of due process by the retroactive application of § 2466, enacted in 2000, to her forfeiture proceeding, which was initiated in 1999. "When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). In connection with CAFRA's revisions to the civil forfeiture laws, Congress did provide generally for new provisions of law to apply only to cases commenced 120 days after the April 25, 2000 enactment date. *See* CAFRA § 21 (codified at 8 U.S.C. § 1324 note). Congress provided an exception, however, for § 2466, making that provision applicable "to any case *pending* on or after the date of the enactment of the Act." *Id.* § 14(c) (codified at 28 U.S.C. § 2466 note) (emphasis added). Ms. Collazos does not dispute Congress's

intent to apply § 2466 retroactively. Instead, she asserts that Congress could not constitutionally make this choice because a fugitive's right to defend a forfeiture action, as recognized in *Degen*, is akin to a property right that cannot be withdrawn retroactively consistent with due process.

We need not address this argument, however, because it is not supported by the record. In Ms. Collazos's case, the statute does not "attach[ ] new legal consequences to events completed before its enactment," *Landgraf v. USI Film Prods.*, 511 U.S. at 270, 114 S.Ct. 1483, that is, to the alleged money-laundering activities that gave rise to the forfeiture of her Prudential Account. Instead, the legal consequences authorized by § 2466 pertain to Ms. Collazos's post-enactment conduct, specifically, to her failure, from August 2001 through October 2002, to enter the United States to face pending criminal charges. Ms. Collazos had no right to evade prosecution on these charges either before or after the enactment of § 2466. Thus, when, despite notice and an opportunity to be heard on a § 2466 motion, she persisted in refusing to enter this country through 2002, the district court's disentitlement order involved no retroactive application of law.

### III. *Conclusion*

To summarize, we hold (1) that disentitlement pursuant to 28 U.S.C. § 2466 is not limited to persons viewed as "fugitives" at common law but also applies to persons, such as Ms. Collazos, whose criminal conduct outside the United States subjects them to prosecution in this country and who, knowing that their arrest is sought, deliberately refuse to enter the United States in order to avoid prosecution. Further, we hold (2) that § 2466 disentitlement does not violate due process because the statute does not punitively

deprive a person of the right to be heard in connection with civil forfeiture. Rather, it establishes a presumption that a person who refuses to produce himself in connection with criminal charges relating to the civil forfeiture has no meritorious defense against the latter action. Because a person can defeat that presumption by appearing in the criminal case, a deliberate choice not to do so constitutes a knowing waiver of the hearing otherwise available by law. Finally, we hold (3) that § 2466 is not applied retroactively when a person whose property was seized before CAFRA's enactment refuses to enter the United States thereafter.

The district court's judgment of October 25, 2002, is hereby AFFIRMED.

KATZMANN, Circuit Judge, concurring.

Although I concur in the result reached by the majority, I write separately to emphasize a discrepancy between the legislative history and the plain language of the "Fugitive disentitlement" provision of the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), Pub.L. No. 106–185, § 14, 114 Stat. 202, 219 (2000) (codified at 28 U.S.C. § 2466). While I agree that we are bound to adhere to the unambiguous meaning of a statute, the explanations advanced by the proponents of § 2466 indicate that these supporters of the legislation may not have intended to sweep as broadly as the statutory text suggests. By its terms, the statute specifies that forfeiture will result if an individual subject to a criminal warrant or process attempts to avoid prosecution by "declin[ing] to enter or reenter the United States to submit to its jurisdiction." 28 U.S.C. § 2466(a)(1)(B). This language covers non-citizens who have never entered the United States and reaches much further than the fugitive disentitlement doctrine at common law. Administration

sponsors of the "Fugitive disentitlement" section and the "enter or reenter" language opined on several occasions, however, that the provision simply reinstated the common law doctrine of fugitive disentitlement.

Deliberations on similar bills had been underway for several years before Congress ultimately enacted CAFRA. A few such bills were under discussion during the 105th Congress, from 1996 to 1997, including one supported by the Administration and introduced by then-Representative Charles Schumer that was referred to as the "Forfeiture Act of 1997," H.R. 1745, 105th Cong. (1997). This bill—proposed less than a year after the Supreme Court invalidated judicially accomplished fugitive disentitlement in *Degen v. United States*, 517 U.S. 820, 116 S.Ct. 1777, 135 L.Ed.2d 102 (1996)—was the first of the civil forfeiture reform proposals to refer to fugitive disentitlement. The text of this bill employed the same "enter or reenter language" as CAFRA. *See* H.R. 1745, § 416 ("Fugitive disentitlement[:] Any person who, in order to avoid criminal prosecution, purposely leaves the jurisdiction of the United States, declines to enter or reenter the United States to submit to its jurisdiction, or otherwise evades the jurisdiction of the court where a criminal case is pending against the person, may not use the resources of the courts of the United States in furtherance of a claim in any related civil forfeiture action or a claim in third-party proceedings in any related criminal forfeiture action."). In presenting this Administration bill to the House Judiciary Committee, Stefan Cassella, the Assistant Chief of the Asset Forfeiture and Money Laundering Section at the Criminal Division of the Department of Justice, provided a section-by-section analysis. According to the description of § 416:

This provision authorizes the district court to bar a fugitive from justice from

attempting to hide behind his fugitive status while contesting a civil forfeiture action against his property. It reinstates what is commonly known as the fugitive disentitlement doctrine under which "a person who is a fugitive from justice may not use the resources of the civil legal system while disregarding its lawful orders in a related criminal action." *United States v. Eng*, 951 F.2d 461, 464 (2d Cir.1991) (applying the doctrine to bar an appellant who was resisting extradition from participating in related civil forfeiture proceedings).

*Eng* and similar cases in other circuits applied a judicially created rule intended to protect the integrity of the judicial process from abuse by a fugitive in a criminal case. But in *Degen v. United States*, [517 U.S. 820, 116 S.Ct. 1777, 135 L.Ed.2d 102] (1996), the Supreme Court held that as a judge-made rule, the sanction of absolute disentitlement goes too far. In the absence of legislative authority to bar a fugitive from filing a claim, courts must resort to other devices to prevent a fugitive from abusing the discovery rules or otherwise taking advantage of his fugitive status in litigating a civil forfeiture case, such as imposing sanctions for failure to comply with discovery orders.

These devices, however, are not adequate to address the problems that arise when fugitives contest forfeiture actions....

This provision addresses these concerns through legislation, thus imposing the straightforward sanction of disentitlement that judges by themselves are not able to impose without statutory authorization. Under the proposal, the doctrine would apply in all civil forfeiture cases such as *Eng* as well as the ancillary proceedings in criminal forfeitures in which fugitive third-parties might otherwise be able to file claims.

> *For the purposes of this provision, a fugitive from justice would be any person who, in order to avoid criminal prosecution, purposely leaves the jurisdiction or decides not to return to it. See 951 F.2d at 464.*

*Civil Asset Forfeiture Reform Act: Hearing before the House Comm. on the Judiciary on H.R. 1835*, 105th Cong. 92 (1997) (emphasis added). This analysis of the fugitive disentitlement provision not only explained its purpose as simply that of reinstating fugitive disentitlement as judicially practiced before *Degen*, but also explicitly referred to the definition of a fugitive provided in *Eng*, which had explained that, "[w]hen a person purposely leaves the jurisdiction or decides not to return to it, in order to avoid prosecution, he is a fugitive." *Eng*, 951 F.2d at 464. Nowhere did *Eng* advert to a person who declined to enter the United States for the first time to submit to jurisdiction as a fugitive.

A comparable disparity between the legislative language and the description provided by proponents characterized the fugitive disentitlement provision introduced during the 106th Congress, that which enacted CAFRA. The House had passed a civil forfeiture reform bill, *see* H.R. 1658, 106th Cong. (2000), to which the Administration had offered an alternative. During a hearing before the Senate Judiciary Committee's Subcommittee on Criminal Justice Oversight, Eric H. Holder, the Deputy Attorney General at the Department of Justice, explained what the Administration deemed certain inadequacies in the House bill, which did not include a discussion of fugitive disentitlement. As he noted,

> [I]n the course of revising the civil forfeiture laws, we should address the problem that arises when claims are filed by fugitives. Before 1996, the fed-

eral courts employed a rule, known as the fugitive disentitlement doctrine, that barred a fugitive from justice from attempting to hide behind his fugitive status while contesting a civil forfeiture action against his property. *See* [*Eng*, 951 F.2d at 464] ("a person who is a fugitive from justice may not use the resources of the civil legal system while disregarding its lawful orders in a related criminal action").

But in 1996, the Supreme Court held in *Degen*, [517 U.S. 820, 116 S.Ct. 1777, 135 L.Ed.2d 102], that as a judge-made rule, the sanction of absolute disentitlement goes too far. Instead, it is left to Congress to enact a statute that, as the Court described it, avoids "the spectacle of a criminal defendant reposing in Switzerland, beyond the reach of our criminal courts, while at the same time mailing papers to the court in a related civil action and expecting them to be honored." *Degen*, [517 U.S. at 828, 116 S.Ct. at 1782]. Codification of the fugitive disentitlement doctrine is an essential part of any civil forfeiture reform. *Hearing Before the Subcomm. on Criminal Justice Oversight of the Sen. Judiciary Comm. on Federal Asset Forfeiture, Fo-*

*cusing on its Role in Fighting Crime and the Need for Reform of the Asset Forfeiture Laws,* 106th Cong. (1999). Despite this statement indicating that the Administration's proposal simply entailed statutorily enacting the previously judicial fugitive disentitlement doctrine, the language of the resulting Senate bill, introduced by Senators Sessions and Schumer, was identical to that employed in 1997. *See* S. 1701, 106th Cong. § 26 (1999).

These passages—and the absence of any contrary gloss upon the phrase "enter or reenter" in the legislative history—strongly suggest that those who crafted the fugitive disentitlement section of CAFRA simply intended to reinstate the common law doctrine, including its limitations upon the definition of fugitive.[1] As *Eng* aptly summarized, this common law understanding includes only those who "purposely leave[ ] the jurisdiction or decide[ ] not to return to it." *Eng*, 951 F.2d at 464; *see also Empire Blue Cross & Blue Shield v. Finkelstein,* 111 F.3d 278, 281 (2d Cir.1997) ("A fugitive from justice has been defined as '[a] person who, having committed a crime, flees from [the] jurisdiction of [the] court where [a] crime was committed or departs

---

**1.** Senator Leahy had previously introduced a bill containing a provision with language similar to that of § 2466, and explained that the section was intended to help stop drug kingpins and terrorists from using U.S. courts. *See* 144 Cong. Rec. S10423–02, S10433 (1998) (statement of Sen. Leahy) ("Crime increasingly has an international face, from drug kingpins to millionaire terrorists, like Usama bin Laden.... Fugitive Disentitlement to stop drug kingpins, terrorists and other international fugitives from using our courts to fight to keep the proceeds of the very crimes for which they are wanted. Criminals should not be able to use our courts at the same time they are evading our laws."). However, neither this bill—the "Safe Schools, Safe Streets, and Secure Borders Act of 1998," S. 2484, 105th Cong. (1998)—nor a subsequent one that Senator Leahy co-spon-

sored containing the same language—the "Denying Safe Haven to International and War Criminals Act of 1999," S. 1754, 106th Cong. (1999)—passed. Nor did they function as part of a comprehensive program of civil forfeiture reform, as did both the Forfeiture Act of 1998 and CAFRA. Furthermore, the language of the fugitive disentitlement section of CAFRA as enacted conforms more to the common law than that contained in the "Safe Schools" or "Denying Safe Havens" legislation. Most notably, § 2466 permits the judge to determine whether or not forfeiture applies rather than mandating that fugitives automatically suffer dismissal of their civil forfeiture claims. *See* 28 U.S.C. § 2466(a) ("A judicial officer *may* disallow a person from using the resources of the courts of the United States in furtherance of a claim ....") (emphasis added).

from his usual place of abode and conceals himself within the district.' *Black's Law Dictionary*, 5th ed. (1979)"). This disparity between the legislative history and the statutory text, combined with the possibly significant impact of construing the terms of Section 2466 as covering a wide range of foreign individuals,[2] suggest that Congress may wish to provide further guidance as to its precise intentions.

---

**2.** Although Stella Collazos herself appears to have been in the United States previously, in 1977, *see* [Majority Opinion at 11], the government stated at oral argument that it would not hesitate to apply § 2466 against non-citizens who had never entered the country.