**UNITED STATES of America,
Plaintiff,**

**v.**

**CONTENTS OF ACCOUNT NUMBER 68108021 Held in the Name of Stella Collazos Located at Prudential Securities, Inc., 199 Water Street, New York, New York, Defendant-in-rem.**

**No. 99 CIV. 2143(JES).**

United States District Court,
S.D. New York.

Oct. 23, 2002.

or property and business ties.

Bondy & Schloss LLP, New York City, Joel M. Wolosky, of counsel, for Stella Collazos.

Mary Jo White, U.S. Atty., Southern Dist. of New York, New York City, for U.S.

## MEMORANDUM OPINION AND ORDER

SPRIZZO, District Judge.

The United States of America ("the Government") brings this action seeking judicial forfeiture of the defendant-in-rem account, currently held in the name of Stella Collazos ("Collazos" or "claimant") at Prudential Securities, Inc. in New York City. Specifically, the Government's instant motion seeks to dismiss the claim of the account's sole claimant, Ms. Collazos, pursuant to 28 U.S.C. § 2466, the fugitive disentitlement provision. For the reasons set forth below, the Government's motion to dismiss is granted and judgment is entered in favor of the Government in an amount equal to that contained in the defendant-in-rem account.

## BACKGROUND

The Government commenced this action on March 22, 1999 pursuant to 18 U.S.C. § 981(a)(1)(A) and 21 U.S.C. § 881(a)(6). The Government seeks the judicial forfeiture of the contents of account number 68108021, held in the name of Collazos at Prudential Securities, Inc., 199 Water Street, New York, New York, 10292 (the "defendant-in-rem account"). The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355.

The Government maintains that the defendant-in-rem account contains funds derived from narcotics trafficking that were subsequently laundered through Collazos' United States-based money remitting businesses in Texas, Florida and New Jersey and her Columbian-based exchange house business. For example, according to the Government, the evidence shows that Collazos owned and operated a Texas money remitting business known as UFF from her place of business in Cali, Columbia even though the business was registered and licensed under another individual's name. A state audit of UFF uncovered evidence of illegal activity, including false paperwork purporting to represent the receipt of millions of dollars in cash from various individuals wanting to remit money abroad. The currency deposited by UFF also tested positive for the presence of cocaine. Through money remitting businesses such as UFF, the Government as-

serts, Collazos wired millions of dollars into a host of nominee back accounts at BankAtlantic in Florida and later moved this money out of the country, most commonly to Collazos' Columbia exchange houses. From January 1995 through April 1996, in fact, ninety-five percent (95%) of UFF's total wire volume was directed towards various bank accounts at BankAtlantic.

The movement of the funds at issue in this case immediately followed the execution of a search warrant at UFF in May 1996. In subsequent telephone conversations and facsimile transmissions—which were intercepted pursuant to a federal court-ordered wire tap—Collazos acknowledged the fictitious nominee accounts at BankAtlantic and the need to change the names on the accounts to avoid detection. As part of her efforts to conceal funds from law enforcement, the Government maintains that Collazos attempted to wire $650,000 from two of her nominee accounts at BankAtlantic to a personal brokerage account held in her name in New York. She similarly wired an additional $450,000 directly from her money remitting businesses in Florida and New Jersey.

Based on the above, a seizure warrant for the defendant-in-rem account was issued on June 10, 1996 by the Criminal Court for the City of New York. Thereafter, on October 11, 1996, the United States Customs Service, New York Identification Removal Group, adopted the forfeiture of the seized $1.1 million dollars from the Office of the Attorney General of the State of New York based on a turnover order issued by the Criminal Court of New York on September 24, 1996. Collazos was notified of the seizure and her right to petition for relief from forfeiture by letter dated October 23, 1996. On December 12, 1996

she filed a cash bond and requested that the case be referred for judicial forfeiture. The Government filed this action for forfeiture in March, 1999. To date, Collazos has not appeared in the civil forfeiture action; on the contrary, she has directly disobeyed the Court by refusing to appear for a court-ordered deposition.

Subsequent to the filing of the instant action and based upon the same underlying activity, Collazos was indicted by a federal grand jury in the Southern District of Florida. The Indictment, which was unsealed on August 13, 2001, alleges violations of the federal money laundering statutes.[1] In October, 2001, in connection with the Florida action, Collazos' defense attorney, Peter Raben, contacted Russell Killinger, the Assistant United States Attorney in the Southern District of Florida ("AUSA Killinger"), stating that Collazos would consider entering the United States and voluntarily submitting to the jurisdiction of the federal court in Florida so long as she was granted pre-trial release in exchange. AUSA Killinger denied the request, pointing to Collazos' fugitive status and status as a flight risk, generally.

## DISCUSSION

The federal civil forfeiture statute subjects to forfeiture, *inter alia*, "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of ... section 1956 or 1957 of this title, or any property traceable to such property." 18 U.S.C. § 981 (2002). Section 1956(a), commonly known as the "money laundering statute," in turn imposes criminal penalty upon:

Whoever knowing that the property involved in a financial transaction represents the proceeds of some form of un-

---

1. It is also believed that Collazos is wanted on an arrest warrant in Cali, Columbia based on

charges similar to those of money laundering.

lawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity ... with the intent to promote the carrying on of specified unlawful activity; or ... knowing that the transaction is designed in whole or in part ... to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity ....

18 U.S.C. § 1956(a)(1)(A)(i), (B)(i) (2002).[2] Moreover, § 1957 imposes a criminal penalty on any person who, "knowingly engages in or attempts to engage in a monetary transaction in criminally derived property that is of a value greater than $10,000 and is derived from specified activity."[3]

Ordinarily, an individual claimant has the right to petition a court to prevent the civil forfeiture of assets. Pursuant to the fugitive disentitlement provision of the recently-enacted Civil Asset Forfeiture Reform Act ("CAFRA"), courts have the authority to dismiss such a claim if the claimant is a "fugitive" as the statute defines the term. *See* 28 U.S.C.A. § 2466 (West Supp.2002). Prior to CAFRA, courts routinely utilized a judicially-created fugitive disentitlement doctrine to prevent fugitives from litigating civil forfeiture and other claims, *see, e.g., Molinaro v. New Jersey*, 396 U.S. 365, 90 S.Ct. 498, 24 L.Ed.2d 586 (1970) (refusing to hear criminal appeal); *Smith v. United States*, 94 U.S. 97, 24 L.Ed. 32 (1876) (same); *United States v. Real Property at Incline Village*, 47 F.3d 1511 (9th Cir.1995) (af-

firming district court's dismissal of civil forfeiture action); *United States v. Eng*, 951 F.2d 461 (2d Cir.1991) (same), based on the concept that a "fugitive from justice has demonstrated such disrespect for the legal profession that he has no right to call upon the court to adjudicate his claim." *Ortega–Rodriguez v. United States*, 507 U.S. 234, 246, 113 S.Ct. 1199, 122 L.Ed.2d 581 (1993). This history notwithstanding, the Supreme Court signaled the need for the codification of this doctrine with its decision in *Degen v. United States*, 517 U.S. 820, 116 S.Ct. 1777, 135 L.Ed.2d 102 (1996).

In *Degen*, the Supreme Court concluded that although "the spectacle of a criminal defendant residing in Switzerland, beyond the reach of our criminal courts, while at the same time mailing papers to the court in related civil matter" is not one to be encouraged, courts cannot employ their inherent judicial authority to preclude a fugitive from participating in a civil forfeiture action absent specific statutory authority. In response, Congress granted the courts such explicit authority by incorporating the fugitive disentitlement doctrine into CAFRA.

The fugitive disentitlement provision provides that:

(a) A judicial officer may disallow a person from using the resources of the courts of the United States in furtherance of a claim in any related civil forfeiture action or a claim in a third party proceeding in any related criminal forfeiture action upon a finding that such person—

**2.** In defining "specified unlawful activity," 18 U.S.C. § 1956(c)(7) incorporates those offenses listed under § 1961(1) of the same title, including "the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in controlled substance ... punishable under any law of the United States."

**3.** The defendant-in-rem account is also subject to seizure and forfeiture pursuant to 21 U.S.C. § 881(a)(6), which applies to all proceeds traceable to exchanges of controlled substances in violation of Title 21 of the United States Code.

(1) after notice or knowledge of the fact that a warrant or process has been issued for his apprehension, in order to avoid criminal prosecution-

(A) purposely leaves the jurisdiction of the United States;

(B) declines to enter or reenter the United States or submit to its jurisdiction; or

(C) otherwise evades the jurisdiction of the court in which a criminal case is pending against the person; and

(2) is not confined or held in custody in any other jurisdiction for commission of criminal conduct in that jurisdiction.

28 U.S.C. § 2466.

Although there are, to date, no federal court opinions applying § 2466, it is clear from the language of the statute that in applying the law to a case such as this one, the Court must first determine whether the instant civil forfeiture action is, in fact, related to a pending criminal prosecution and whether the claimant has had appropriate notice of such prosecution. If both questions can be answered in the affirmative, the Court must then turn to the question of whether the claimant purposefully left, declined to enter or reenter, or otherwise evaded the jurisdiction of the United States and/or the court in which a criminal prosecution is pending.[4] In this case, the Court finds that the instant forfeiture action is substantially related to the criminal proceeding pending in the Southern District of Florida, that the claimant had knowledge of the Florida action, and that the claimant has consciously declined to enter the United States to avoid criminal prosecution in connection with such proceeding. Moreover, the Court holds that the claimant's past conduct is of the pre-

cise sort Congress intended to prevent with the passing of the fugitive disentitlement provision. Accordingly, as discussed more thoroughly below. Collazos's claim is dismissed.

■ As noted, the Court must initially address the question of whether the forfeiture action is related to a pending criminal proceeding. Although § 2466 does not define the term "related" as used in subsection (a) of that section, the term is defined in a separate subsection under the same title that authorizes the Government to move for a stay of discovery in a civil forfeiture action when such discovery would impede the prosecution of a "related" criminal case or investigation. That subsection states:

(4) [I]n determining whether a criminal case or investigation is 'related' to a civil forfeiture proceeding, the court shall consider the degree of similarity between the parties, witnesses, facts, and circumstances involved in the two proceedings, without requiring an identity with respect to any one or more factors.

18 U.S.C. § 981(g)(4).

Here, the Government's instant civil forfeiture action is clearly related to the pending federal criminal proceeding in Florida. The Florida Indictment—which is the basis for a pending arrest warrant against Collazos—seeks exactly the same funds at issue in this case. *See United States v. Ortiz, et al.,* No. 01–0539 (S.D.Fla. Aug. 2, 2001). Moreover, the Florida criminal action and the instant forfeiture action are based on the same facts and circumstances—namely, the laundering of proceeds from narcotics transactions through money remitting and exchange house businesses within and without the United States. *See id.* Indeed, numerous

---

4. There is no contention that Collazos is in any way confined or detained in Columbia.

Thus, subsection (2) is inapplicable to this case.

times throughout the trial of Collazos' co-defendant, Blanca Piedad Ortiz, witnesses testified to Collazos' role in the illegal activity at issue—the same illegal activity upon which the Government rests its forfeiture application.

For example, during the direct examination of government witness David White, a former special agent for the United States Customs Service, the following colloquy took place:

Q. At some point during your investigation up to and include [sic] December of '95, did an individual by the name of Stella Collazos become a target of your investigation?

A. Yes.

Q. And who was Stella Collazos?

A. Stella Collazos is an owner of several enterprises in Columbia that she utilizes to facilitate the movement of the dollar/peso exchange. She's an unregulated, unlicensed black-market peso dealer.

Q. In Columbia?

A. In Columbia.

Q. [W]ere you able to, during your investigation, uncover any businesses or establishments or enterprises that Ms. Collazos was associated with in the United States?

A. Yes.

Q. What was that?

A. [W]e uncovered that Stella Collazos owned and operated five casas de cambios, exchanges houses here in the United States: one in Houston, Texas, two here in Miami, and two in New Jersey.

Q. What was the name of the establishment in Houston?

A. UFF . . . .

Trans. of Tr. at 313–14, *United States v. Ortiz*, No. 01–539–CR ("Trans. of Tr."). This same money remitting business, UFF, as well as those in Florida and New Jersey, are at the heart of the Govern-ment's complaint in the instant forfeiture action.

Similarly, Ruben Dario Riascos–Mendez, an incarcerated government witness who at one time worked for Collazos, testified on direct examination to the following regarding the mechanics of Collazos' operations:

Q. When you would talk to Stella Collazos, how would you refer to her?

A. La Dona.

. . . .

Q. Okay. Did you ever have any conversations with Stella . . . regarding the commissions or the amount of money that Stella was charging to launder money?

A. I had to.

Q. Okay. And were there different commissions that were charged for different methods of money laundering?

A. Yes, sir.

Q. Would you tell the jury about that, the different methods and different commissions.

A. It depended. If it was done through an exchange office here in the United States and she provided the name of the people, the list of the names of people who were to receive the wire transfer, the percentage would be different. If the person who was going to make the wire transfer was going to do it through her offices to Columbia, then the percentage changed.

Trans. of Tr. at 352.

The Government also called David Boatright, chief investigator in charge of crimes of money laundering for the Office of Attorney General in Texas. Boatright, similar to the above two witnesses, would likely be called by the Government to testify in the instant civil forfeiture action were it to proceed because he is able to corroborate facts central to the Government's the-

ory of the case. Specifically, Boatright testified that despite her efforts to conceal it, Collazos was the true owner and controller of UFF, Texas, as well as other domestic money exchange and remitting businesses. Indeed, Boatright's testimony included the following:

> Q. [W]as [UFF Money & Exchange] one of the several that you focused your attention on?
>
> A. Yes, sir. We investigated about 15 different giros houses in the Houston area that were responsible for multi-million dollar [sic] of money transfers; and UFF Money ... was one of those 15 we investigated.
>
> . . . .
>
> Q. And were you able to determine who the owner of UFF, Houston, Texas was at the time of your investigation?
>
> A. Yes, sir. But that was part of the problem—that was part of the evidence in the investigation. The owner on paper said one thing, but we developed evidence that the actual owner was someone different.
>
> Q. On paper, who did you determine the owner to be?
>
> A. A lady by the name of Alba Arias.
>
> Q. And who did you determine the true owner to be, or the one that was actually controlling the business?
>
> A. Stella Collazos. In fact, in Texas, we indicted Ms. Collazos and Ms. Arias for that ... licensure problem.

Trans. of Tr. 550–52.

Lastly, testimony elicited at the Florida trial related specifically to the funds currently held in New York and at issue in the instant action. As Lucia Ramirez, a government witness, testified, referring to the actions taken by Collazos in response to the Government's efforts to seize her bank accounts in May, 1996:

> Q: [D]id you and Piedad Ortiz or you under her direction or together wire transfer out of BankAtlantic $657,000 first to Europe, then back to the bank, and then to New York?
>
> A: Yes, sir, I did.
>
> . . . .
>
> Q: [W]hen you did that, on May 31st, when you sent that money out of the bank, you did it to assist Stella Collazos to conceal that money from any investigators, didn't you?
>
> A: Yes, sir.
>
> Q: To get it out of the bank?
>
> A: Yes.
>
> Q: Before it could be seized?
>
> A: Yes, sir.

Trans. of Tr. at 1059–60.

In sum, the trial transcript is replete with testimony establishing, *inter alia*, that Collazos laundered narcotics proceeds through her money remitting businesses and through accounts she and Piedad Ortiz managed at BankAtlantic. Furthermore, it is clear that the defendant-in-rem funds are directly traceable to that same money laundering scheme.

There similarly can be no dispute that Collazos had notice of the Florida proceeding. Indeed, as noted above, AUSA Killinger represented at a pre-trial conference in the Florida action on October 18, 2001, that Collazos' defense attorney, Peter Raben, contacted AUSA Killinger the week prior, seeking to negotiate an arrangement with respect to Collazos' Florida criminal prosecution. *See* Trans. of Status Conf. at 4–6. *United States v. Ortiz*, No. 01–539–CR (S.D.Fla. Oct. 18, 2001). Specifically, Raben stated that he had been in contact with Collazos who was not currently within the boundaries of the United States but might agree to voluntarily submit to the jurisdiction of the Florida court were the government to agree to the condition of pre-trial release. *Id.* at 5. AUSA Killinger denied Raben's request, noting that in light of the long-

pending civil forfeiture action in this Court—during which Collazos has refused to submit herself to the Court's jurisdiction for deposition or otherwise—he would not only deny the defense's a request but would vigorously press for pre-trial detention if Collazos surrendered. *Id.*

■ Having determined that the instant forfeiture action is indeed related to the federal criminal action pending in Florida, and that claimant had knowledge of such action, the Court need only determine whether in light of the pending criminal action, Collazos either (1) purposely left the jurisdiction of the United States; (2) declined to enter, reenter, or otherwise submit to the jurisdiction of the United States; or (3) otherwise evaded the jurisdiction of the court in which a criminal case is pending against her. § 2466(a)(1)(A)-(C). Following an extensive review of the record and as discussed below, the Court concludes that Collazos has intentionally evaded and refused to submit to the jurisdiction of both federal and state courts in which criminal prosecutions are pending against her. Section 2466, therefore, is applicable to Collazos' claim. The Court concludes therefore that Collazos' claim as to the defendant-in-rem account should be dismissed.

Indeed, Collazos knew about the Florida Indictment as early as August 14, 2001, when her attorney received a copy of the theretofore sealed document. Despite this knowledge, Collazos declined to face the charges against her; rather, Collazos had her attorney contact the United States Attorney's Office while she remained in Columbia and insist on pre-trial release as a condition of her reentering the country and voluntarily submitting to the court's

jurisdiction. Since the Office's understandable denial of this request, Collazos has continued to evade the federal courts, thereby frustrating the exercise of justice in the Florida criminal action and, consequently, the civil action before this Court.

The above requirement is further satisfied in this case by Collazos' refusal to submit to the jurisdiction of the state of Texas where she is subject to an arrest warrant, relating to her control of illegal money remitting businesses.[5] Similar to the Florida action. Collazos has long had knowledge of the Texas warrant; in fact, it served as the primary reason given by her prior counsel, Martin Auerbach, for being unable to attend her noticed deposition in the instant case in July of 1999.

Notwithstanding these facts and the plain language of the statute, Collazos argues—relying solely on case law that predates the codification of CAFRA—that she is not a "fugitive" in the legal sense because she was not present in the relevant jurisdictions when the illegal activities were conducted. According to Collazos, she has not been in the United States since 1977.

Even if the Court accepted Collazos' representation regarding the last time she was present in the country, the argument that she is, therefore, not covered under the fugitive disentitlement provision is fallacious and contradicts the plain language of the statute. Subsection (B) states explicitly that a fugitive for the purposes of the statute is anyone who "decline[s] to *enter or reenter* the United States." § 2466(a)(1)(B) (emphasis added). By including the word "enter" in addition to "reenter." Congress must have intended the statute to cover not only those fugitive

5. The construction of § 2466 makes clear that the fugitive disentitlement provision was intended to reach conduct involving not only the evasion of federal court jurisdiction but also that of the state and local courts. Sub-

section (C) sets forth that the provision applies to someone who "evade[s] the jurisdiction of the court in which a criminal case is pending against the person."

claimants that decline to come back to the United States, but also those that never entered the United States in the first place. Collazos' interpretation is thus contrary to the statute's clear language. *See Duncan v. Walker*, 533 U.S. 167, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001) (stating that when construing statutes, courts have duty to give effect to every word and not construe any words to be superfluous). The Court's interpretation is also consistent with the fact that many of the laws, which, if violated, give rise to forfeiture under CAFRA, similarly extend to defendants who may never have been present in the United States. *Cf. Moncrief v. Anderson*, 342 F.2d 902, 904 n.2 (D.C.Cir.1964) (stating exception to general rule of fugitivity that person be physically present in state where crime was committed for crimes such as conspiracy that can be committed from outside jurisdiction).

■ Lastly, Collazos argues that even if the Court determines that § 2466 is applicable to the facts of this case, the Court should nonetheless deny the Government's request to dismiss her claim because the fugitive disentitlement provision is unconstitutional as violative of the Due Process Clause of the Fifth Amendment. In so arguing, Collazos relies primarily on the Supreme Court's decision in Degen and the cases cited therein. Collazos is correct that the Court in Degen expressed hesitation regarding the constitutionality of a court-enforced fugitive disentitlement doctrine; however, that feeling was based on the idea that "a *court-made* [disentitlement] rule ... would be an arbitrary response to the conduct that it is supposed to redress or discourage." *Degen*, 517 U.S. at

828, 116 S.Ct. 1777 (emphasis added). The Court was most concerned with the appropriate exercise of the inherant powers vested in the courts of the United States. Addressing the risk associated with these powers, the Court stated: "[T]here is a danger of overreaching when one branch of the Government, without the benefit of cooperation or correction from the others, undertakes to define its own authority." *Id.* at 822–23, 116 S.Ct. 1777. Then suggesting how Congress could reign in this power, the Court noted that "[i]n many instances the courts may be controlled or overridden by statute or rule." *Id.* at 823, 116 S.Ct. 1777. Section 2466 was clearly the next step envisioned by the Court.

However, the Court in *Degen* opted to not opine on the issue of whether a statutory fugitive disentitlement rule would violate due process. As a result, this Court must look to Second Circuit precedent on this separate and distinct issue. Although it is true that "[i]n the ordinary case a citizen has a right to a hearing to contest the forfeiture of his property," *United States v. Good Real Property*, 510 U.S. 43, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993), the Second Circuit has stated that "[t]he [fugitive disentitlement] doctrine operates as a waiver by a fugitive of his due process rights in related civil forfeiture proceedings." *Eng*, 951 F.2d at 466, *citing, United States v. Forty–Five Thousand Nine Hundred Forty Dollars*, 739 F.2d 792, 797 (2d Cir.1984) (claimant "waive[s] his right to due process in [a] civil forfeiture proceeding by remaining a fugitive").[6] The Court concludes, therefore, that the implementation of § 2466 does not violate Collazos' right to due process.[7]

---

**6.** As the court in *Eng* noted, the only court with a contrary holding on the issue was concerned primarily with jeopardizing the rights of others who, in addition to the fugitive, might seek to file claims to the in rem proceeding. *See Eng*, 951 F.2d at 465. In this case, as in *Eng*, that is not a relevant

consideration because the fugitive is the sole claimant.

**7.** Collazos' argument is all the more weakened by the fact that the Second Circuit has found no due process violation to exist even where forfeiture claimants have been forced

## CONCLUSION

For the foregoing reasons, the Government's motion to dismiss pursuant to 28 U.S.C. § 2466 is hereby granted and judgment is hereby entered in favor of the Government in an amount equal to that contained in the defendant-in-rem account. The Clerk of Court is hereby directed to close the above-captioned action.

**It is SO ORDERED.**

Before this Court is an application by the movant, defendants outgoing counsel to choose between litigating property rights through the forfeiture action and exercising constitutional rights. *See, e.g., United States v. Certain Real Property and Premises Known as 4003–4005 Fifth Avenue,* 55 F.3d 78, 83 (2d Cir.1995) (recognizing that there is no due process violation created by tension in civil forfeiture actions that claimants face between remaining silent and allowing forfeiture or testifying to contest and exposing oneself to incrimination).