**UNITED STATES of America,
Plaintiff,**

v.

**ONE 1988 CHEVROLET CHEYENNE
HALF–TON PICKUP TRUCK, et
al., Defendant.**

No. CIV. 04–0227–WSC.

United States District Court,
S.D. Alabama Southern Division.

Feb. 21, 2005.

Alex F. Lankford, IV, U.S. Attorney's Office, Mobile, AL, for Plaintiff.

Robert Troy Teague, Montgomery, AL, for Defendant.

## ORDER

STEELE, District Judge.

This matter is before the Court on plaintiff United States of America's Motion to Strike Claim, or Alternatively Motion for Partial Summary Judgment (doc. 26). The Motion has been fully briefed and is ripe for disposition at this time.[1]

### I. Background.

On April 13, 2004, the United States filed a Complaint for Forfeiture *In Rem* (doc. 1) pursuant to 21 U.S.C. § 881(a)(6) (forfeiture provision of the Controlled Substance Act) and 31 U.S.C. § 5332(c) (forfeiture provision of the Bulk Cash Smuggling Act).[2] According to the well-pleaded alle-

---

1. Also before the Court is the United States' Motion to Strike (doc. 33) the document attached to Claimant's Brief (doc. 31) as Exhibit A on the grounds that such exhibit is in Spanish, is not translated, is unsigned, does not identify its declarant, lacks indicia of authenticity or veracity, is of unknown origin, and is otherwise inadmissible. This Motion may properly be resolved at this time in tandem with plaintiff's dispositive motion.

2. The former provision provides, in part, that all funds "furnished or intended to be fur-

nished by any person in exchange for a controlled substance . . ., all proceeds traceable to such an exchange, and all moneys . . . used or intended to be used to facilitate any violation of this subchapter" are subject to forfeiture. 21 U.S.C. § 881(a)(6). Meanwhile, the latter provision allows for forfeiture of concealed currency or other property involved in a bulk cash smuggling violation wherein unreported concealed currency in excess of $10,000 is transported into or out of the United States. 31 U.S.C. § 5332(c).

gations of the Complaint, on November 19, 2003, an Alabama State Trooper stopped claimant Jose Luis Verdin Aguila ("Aguila") for following too closely and improper tag display. After noting that Aguila appeared nervous and that he admitted having $1,200 on his person, the trooper requested and received consent to search the 1988 Chevrolet Cheyenne Half–Ton Pickup Truck (the "Truck") being driven by Aguila. During the search, the trooper spotted after-market modifications on the Truck in the form of two trapdoors under the bed-liner on each side of the bed, near the wheel wells. Removal of those doors revealed a compartment containing $313,030 in United States currency in vacuum-sealed packages wrapped in foil. Aguila was found to be in possession of an additional $5,900 on his person, not just the $1,200 he had identified. These funds totaling $318,930 (the "Currency") were seized, as was the Truck. At the time of the seizure, Aguila allegedly gave a statement to law enforcement officers in which he acknowledged that he was being paid $4,000 to transport a duffle bag to Nuevo Laredo, Mexico, and that he believed the bag contained illegal drugs or other contraband.[3] The United States initiated this action to effectuate forfeiture of the seized Currency and Truck.[4]

On June 14, 2004, Aguila, by and through counsel of record, filed a Verified Statement of Interest (doc. 13) in this action, in which he asserted that the Truck and the Currency were "his personal property, acquired through his hard work," and that they were neither proceeds of illegal activity nor acquired in any manner involving controlled substances. (*Id.* at 1.) [5] No other person or entity has come forward with a statement of claim to either the Truck or the Currency. In the ensuing months, plaintiff and claimant commenced discovery pursuant to the operative Rule 16(b) Scheduling Order. In October 2004, Aguila served interrogatories and requests for production on the United States; meanwhile, the United States announced its intent to take Aguila's deposition. Correspondence records reflect that on October 26, 2004, Aguila's attorney informed plaintiff's counsel that he "had attempted to contact Mr. Aguila [regarding deposition scheduling] but had been told that he would be out of town until October 27th or

---

**3.** In fact, no contraband was found in the bag, just new clothing with no price tags.

**4.** Aguila was not charged immediately with criminal violations as a result of the November 19, 2003 stop and seizure. Rather, he was released that evening, and apparently returned to Mexico. The record reflects that the United States never confiscated Aguila's passport, and that it returned his B1/B2 visa to him via correspondence with Aguila's attorney in August 2004. (United States Brief, at Exh. E–9.) There appears to be no legal impediment to Aguila re-entering the United States at this time, inasmuch as he apparently possesses both a valid passport and a valid visa for entry. Nonetheless, Aguila evidently remains in Mexico at this time and has not returned to this country since the events of November 2003. A warrant for Aguila's arrest was issued in March 2004, but has never been executed.

**5.** This statement is contradicted by the Affidavit of J.C. Lopez, a Special Agent with Immigration and Customs Enforcement who interviewed Aguila following discovery of the secret compartment. Special Agent Lopez avers that Aguila told him "that he first realized there was money in the truck when the Alabama State Troopers found it on the traffic stop. Mr. Verdin Aguila claimed he had no knowledge of the hidden compartments inside the truck bed walls." (Lopez Aff., at 4.) Special Agent Lopez reports that in a follow-up telephonic discussion regarding the confidential informant program, Aguila "expressed concern for the safety of his family as he had lost the money destined for Mexico to law enforcement in Alabama. Mr. Verdin Aguila said that the owners of the money were very upset with him." (*Id.* at 5.)

28th." (United States Brief (doc. 27), at Exh. E–2.) On November 11, 2004, Aguila's attorney wrote that "frankly, there is no time that is convenient" for Aguila to appear for a deposition, and that he intended to object to the proposed deposition on the basis of undue hardship and other unspecified grounds. (*Id.* at Exh. E–3.) The United States ultimately noticed his deposition for November 23, 2004. At no time did claimant ever file objections to the Notice of Deposition or otherwise seek protection from the Court.

Plaintiff's efforts to depose Aguila in November 2004 occurred contemporaneously with other significant events. Specifically, on November 19, 2004, a criminal indictment against Aguila was unsealed in this judicial district, bearing the caption *United States of America v. Jose Luis Aguila Verdin,* Criminal No. 04–00052. The indictment charged Aguila with two counts of violating the Bulk Cash Smuggling Act, 31 U.S.C. § 5332(a)(1), in connection with the November 19, 2003 seizure of the Currency and the Truck, and one count of providing a false statement to a federal agent, in violation of 18 U.S.C. § 1001(a)(2), when he allegedly informed Special Agent Lopez that he was unaware that money was hidden in the Truck until such funds were discovered by law enforcement officers. The indictment also included a forfeiture count which tracks generally the forfeiture allegations of the

instant civil action, albeit through a criminal law mechanism.[6]

Upon the unsealing of the criminal case, the United States provided Aguila's counsel with copies of the indictment and the outstanding warrant for Aguila's arrest. Having furnished this documentation, plaintiff's counsel inquired as to (a) whether and when Aguila intended to return to the United States to face the criminal charges, and (b) whether Aguila intended to return for his deposition in the civil case as scheduled on November 23. (Plaintiff Brief, at Exh. E–6.) On November 21, 2004, Aguila's counsel responded with a letter indicating that Aguila would not appear for his November 23 deposition, that counsel had spoken with him about "the most recent developments in this cause of action" (which could only refer to the unsealing of the indictment), and that "all the events have affected him very strongly and that he has been under the doctor's care." (*Id.* at Exh. E–7.) Aguila's counsel emphasized that while Aguila had not informed him "of a firm decision as to whether he will come back voluntarily to confront the criminal charges," Aguila wished "to clear all matters" if his health permitted. (*Id.*) The November 21 letter does not elaborate on the nature of Aguila's health problems, nor does it identify any doctor-imposed restrictions on his activities. Aguila did not appear for his scheduled deposition, and never sought leave of court to modify or be excused from compliance with the applicable Notice of Deposition.[7]

---

**6.** The court file reflects that the indictment against Aguila was kept sealed from March 2004 until November 2004 because Aguila had not been arrested, such that the best interest of the case would be served by keeping the indictment sealed pending his arrest.

**7.** Had Aguila wished to object to the deposition in a manner consistent with a willingness to submit to this Court's jurisdiction, he could have filed a motion to quash the deposition

notice or a motion for protective order, as countenanced by the Federal Rules of Civil Procedure. Instead, he simply did not appear, disregarding a facially valid Notice of Deposition and declining to utilize available procedural devices to secure relief from same. Aguila's course of conduct in this regard is further evidence of his unwillingness to submit to the jurisdiction of, or to conform his conduct to the rules of, this Court.

## II. Analysis.

On December 13, 2004, the United States moved to strike Aguila's claim pursuant to the fugitive disentitlement doctrine or, alternatively, for an order granting summary judgment in plaintiff's favor as to Aguila's claim. Aguila received a full opportunity to respond and to place supplemental materials in the record. After careful consideration of the arguments and authorities presented by the parties, the Court is of the opinion that the United States' Motion is due to be granted on principles of fugitive disentitlement.

### A. Evolution of the Fugitive Disentitlement Doctrine.

Federal courts have recognized various permutations of the fugitive disentitlement doctrine for well over a century. In the 1876 case of *Smith v. United States*, 94 U.S. 97, 4 Otto 97, 24 L.Ed. 32 (1876), the Supreme Court declined to entertain an appeal by a criminal defendant who had escaped and was not in custody when his petition reached the Court. The *Smith* Court reasoned that, regardless of whether it affirmed his sentence or reversed it and ordered a new trial, the petitioner would not likely respond or appear. Over time, the doctrine has been refined by both trial and appellate courts into an equitable measure to limit access to the courts by fugitives from justice. *See, e.g., Federal Deposit Insurance Corp. v. Pharaon*, 178 F.3d 1159, 1161 (11th Cir.1999); *United States v. Barnette*, 129 F.3d 1179, 1183–84 (11th Cir.1997).[8] Although a party's fugitive status does not strip a case of its classification as an adjudicable case or con-

troversy (*i.e.*, it does not deprive a court of jurisdiction), it may disentitle that party from availing himself of the court's resources to adjudicate his claims. *See Pharaon*, 178 F.3d at 1161; *Barnette*, 129 F.3d at 1184. This doctrine has traditionally been employed by appellate courts to dismiss fugitives' appeals of their criminal convictions, but it has also been utilized by district courts in civil actions to "sanction or enter judgment against parties on the basis of their fugitive status." *Magluta v. Samples*, 162 F.3d 662, 664 (11th Cir.1998) (explaining that dismissal of civil action on fugitive disentitlement grounds requires showing that plaintiff is a fugitive, that fugitive status is connected to civil action, and that dismissal promotes equitable considerations underlying the doctrine); *see generally Lynn v. United States*, 365 F.3d 1225, 1240 (11th Cir.2004) (noting that where its authority has been questioned by the defendant's flight in a criminal case before it, district court is empowered to use fugitive disentitlement doctrine to protect integrity of the judicial system).

Despite this flourishing body of common law, application of the fugitive disentitlement doctrine in civil forfeiture cases when the claimant is a fugitive from parallel criminal proceedings encountered a major stumbling block in *Degen v. United States*, 517 U.S. 820, 116 S.Ct. 1777, 135 L.Ed.2d 102 (1996), wherein the unanimous Supreme Court recoiled at the prospect of unilateral judicial action dismissing civil forfeiture claims of claimants who were fugitives from justice. The *Degen* Court's holding was predicated on separation of

---

**8.** Rationales underlying this equitable doctrine include "the difficulty of enforcement against one not willing to subject himself to the court's authority; the inequity of allowing a fugitive to use court resources only if the outcome is an aid to him; and the need to avoid prejudice to the nonfugitive party." *Magluta v. Samples*, 162 F.3d 662, 664 (11th Cir.1998); *see also Pesin v. Rodriguez*, 244 F.3d 1250, 1253 (11th Cir.2001) (citing as additional rationales "promoting the efficient operation of the courts" and "discouraging flights from justice"). In the pithy terminology of one appellate panel, "He who offends against the law seeks in vain the help of the law." *Barnette*, 129 F.3d at 1184.

powers concerns with a branch of the government undertaking to define its own authority, without cooperation or input from other branches. Ultimately, that Court ruled as follows:

"[W]e acknowledge disquiet at the spectacle of a criminal defendant reposing in Switzerland, beyond the reach of our criminal courts, while at the same time mailing papers to the court in a related civil action and expecting them to be honored.... A court-made rule striking Degen's claims and entering summary judgment against him as a sanction, however, would be an arbitrary response to the conduct it is supposed to redress or discourage."

517 U.S. at 828, 116 S.Ct. 1777. In the immediate wake of *Degen*, then, use of the fugitive disentitlement doctrine to bar defendants from contesting civil forfeitures was no longer permitted. *See Pharaon*, 178 F.3d at 1162–63 n. 4 (explaining that cases applying fugitive disentitlement in civil forfeiture context were "no longer good law after the Supreme Court's decision in *Degen*"). Following *Degen's* lead, the Eleventh Circuit held that the fugitive disentitlement doctrine could not be applied to any civil case in which the purported fugitive was a defendant, including civil forfeiture actions in which the fugitive was a claimant. *See id.* at 1162–63 ("we think it is very different to bar a fugitive from affirmatively seeking relief than to bar a fugitive from defending civil claims brought against him").

The *Degen*-created void sparked a forceful legislative response. In April 2000, the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA") became law. CAFRA expressly authorized judicial officers to "dis-

allow a person from using the resources of the courts of the United States in furtherance of a claim in any related civil forfeiture action" upon finding each of the following five prerequisites: (1) warrant or process had been issued for the person's arrest; (2) the person had notice or knowledge of such warrant or process; (3) the criminal case was related to the civil forfeiture action; (4) with such knowledge and with the intent to avoid criminal prosecution, the person purposely left the United States, declined "to enter or reenter the United States to submit to its jurisdiction," or otherwise evaded jurisdiction of the court where the criminal action was pending; and (5) the person was not being confined or held in custody in any other jurisdiction. 28 U.S.C. § 2466; *see also Collazos v. United States*, 368 F.3d 190, 198 (2nd Cir.2004) (identifying five statutory conditions to disentitlement under § 2466).[9] Significantly, CAFRA does not mandate disentitlement when its requirements are satisfied; rather, the act is couched in permissive terms that a court "may disallow" a fugitive from invoking federal judicial resources under those circumstances. 28 U.S.C. § 2466; *see also Collazos*, 368 F.3d at 198 (Section 2466 "does not mandate disentitlement; the ultimate decision whether to order disentitlement in a particular case rests in the sound discretion of the district court").

Given § 2466's recent vintage and the relatively rare fact pattern it addresses, there is a dearth of published authorities interpreting and applying it. Nonetheless, courts have not hesitated to exercise discretion in favor of disentitlement upon deeming CAFRA's requirements satisfied. *See United States v. All Right, Title and*

---

**9.** The statute was intended to prevent the "unseemly spectacle" under which a criminal defendant might "attempt[ ] to invoke from a safe distance only so much of a United States court's jurisdiction as might secure him the return of alleged criminal proceeds while carefully shielding himself from the possibility of a penal sanction." *Collazos*, 368 F.3d at 200.

*Interest in Real Property and Appurtenances Located at Trump World Towers,* 2004 WL 1933559, *2–3 (S.D.N.Y. Aug. 31, 2004) (declaring that fugitive who had fled to Portugal to evade money-laundering prosecution could not pursue civil forfeiture claim for assets allegedly acquired with fugitive's ill-gotten gains from money-laundering scheme); *United States v. One Hundred Thirty–Eight Thousand, Three Hundred Eighty–One Dollars in U.S. Currency ($138,381.00),* 240 F.Supp.2d 220, 226 (E.D.N.Y.2003) (granting judgment to United States as a matter of law on fugitive's claim to property that was subject of civil forfeiture action, where all CAFRA criteria were satisfied); *United States v. $1,231,349.68 In Funds,* 227 F.Supp.2d 130, 133 (D.D.C.2002) (striking claim to property in civil forfeiture proceeding, where claimant had fled to Spain without showing intent to face federal prosecution for bribery and fraud); *see generally Collazos,* 368 F.3d at 201 (district court order of disentitlement was not abuse of discretion where record amply supported conclusion that statutory requirements were satisfied).

### B. Application of Fugitive Disentitlement Doctrine.

■ Applying the CAFRA criteria to the case at bar, there can be no reasonable dispute that all five statutory elements are satisfied. First, the court file in the unsealed criminal action reflects that a warrant for Aguila's arrest on charges of bulk cash smuggling, false statements and forfeiture was issued in this District Court on March 30, 2004. Second, correspondence between counsel conclusively establishes that Aguila had actual knowledge of the

existence of the arrest warrant and indictment by no later than November 19, 2004, when the United States faxed copies of the warrant and indictment to Aguila's attorney. (*See* Plaintiff Brief, at Exh. E–6.)[10]

Third, there is no question that the civil forfeiture action (seeking forfeiture of a Truck seized on November 19, 2003, as well as over $300,000 in currency hidden in a secret compartment in that Truck) is "related to" the criminal charges against Aguila, which arise directly from his being apprehended on November 19, 2003 while driving said Truck. "[I]n determining whether a criminal case or investigation is 'related' to a civil forfeiture proceeding, the court shall consider the degree of similarity between the parties, witnesses, facts, and circumstances involved in the two proceedings, without requiring an identity with respect to any one or more factors." *United States v. Contents of Account Number 68108021,* 228 F.Supp.2d 436, 440 (S.D.N.Y.2002) (quoting 18 U.S.C. § 981(g)(4)). Here there appears to be virtual identity of facts, witnesses, circumstances, and relevant events for both the outstanding criminal charges and the instant civil forfeiture action, both of which derive from the events of November 19, 2003. Indeed, it is difficult to envision a closer relationship between a criminal case and a civil forfeiture proceeding than that observed here. *See also Trump World Towers,* 2004 WL 1933559, at *2 ("The relation between the civil and criminal cases at issue here, which involve identical money and property, could not be closer.").

■ Fourth, the Court readily finds from the totality of the evidence that Agui-

---

10. Aguila's actual knowledge of the warrant's existence is verified by his lawyer's letter to plaintiff's counsel dated November 21, 2004, in which he wrote, "I have communicated with [Aguila] in reference [to] the most recent developments in this cause of action." (*Id.* at Exh. E–7.) The only "recent developments" to which Aguila's lawyer could possibly have been referring were the unveiling of the indictment and arrest warrant just two days earlier.

la has, in order to avoid criminal prosecution, "decline[d] to enter or reenter the United States to submit to its jurisdiction." 28 U.S.C. § 2466(a)(1)(B); *see Collazos*, 368 F.3d at 199–200 (applying this provision to encompass, *inter alia*, persons "who may have been in the United States at the time they committed the charged crimes and who refuse to return").[11] As to this requirement, Aguila admits that "no serious argument could be made that the Claimant does not currently meet the definition of a fugitive for purposes of [CAFRA]." (Claimant's Brief (doc. 31), at 3.) Fifth, and finally, there is no evidence or information to suggest that Aguila is presently being confined or otherwise held in custody in Mexico or any other jurisdiction, or that he is otherwise involuntarily prevented from travel to the United States.[12] *See Collazos*, 368 F.3d at 201 ("nothing in the record indicates that Ms. Collazos was ever confined, incarcerated, or unable to travel to the United States of her own volition in the months before the district court ordered disentitlement"). Thus, the record plainly shows, and the Court expressly finds, that all five statutory requirements for disentitlement are satisfied in this case.

## C. Discretionary Authority to Order Aguila Disentitled.

■ Of course, the Court's determination that the five CAFRA criteria are present does not conclude the inquiry. Aguila correctly points out that § 2466 "does not mandate the court to disallow the claimant," but rather confers upon the Court discretion to determine whether or not disentitlement is warranted. (Claimant Brief (doc. 31), at 3.) Aguila urges the Court not to disallow his claim, based on the following factors: (1) his "documented nervous condition"; (2) "the relative weakness of the Plaintiff's admissible evidence against him"; and (3) the Court's ruling on May 17, 2004 that this action could proceed in Aguila's absence without prejudice to any party's interests. (*Id.*) The Court finds none of these arguments persuasive.

### 1. Claimant's Medical Condition.

Aguila's counsel represents to the Court that his client "claims that he has a nervous condition that has prevented his return to the United States." (*Id.* at 2.) In support of this contention, claimant's counsel relies on "Exhibit A," a five-page typewritten document entitled "Historia Clinica Psicologica," written in Spanish and purporting to chronicle Aguila's medical condition.[13] This document is undated, un-

11. That Aguila may not have actually fled this jurisdiction upon learning of the indictment and warrant is of no consequence; rather, constructive flight may be found where a defendant, while legally outside the jurisdiction, decides not to return to face pending criminal charges against him. *See Barnette*, 129 F.3d at 1184 (defendant whose whereabouts are unknown is "for the law's purposes, a fugitive from justice" where he went into hiding and thereby refused to surrender himself to the court's jurisdiction). The record reflects that such is precisely the situation here. Additionally, the only evidence before the Court is that Aguila has been in possession of his passport throughout this action, and that his visa was returned to him in August 2004. As such, the record cannot reasonably support a contention—and Aguila does not, in fact, contend—

that he is unable to reenter the United States because of missing or incomplete immigration paperwork. Though not germane to the instant Motion, the Court also notes a discrepancy between the date of birth reflected on Aguila's visa (06/19/42) and that listed in his doctor's report (06/19/44).

12. Although Aguila maintains that he is under a doctor's care for a nervous condition, he has never contended or shown that he is physically unable to travel to the United States. For further discussion of Aguila's medical defense, see *infra*.

13. The document is actually six pages in length; however, the sixth page is simply an identical duplication of the fifth.

signed, unverified, does not appear on letterhead, and does not identify its author. Moreover, no certified translation accompanies this document, rendering it undecipherable to those not literate in Spanish.

The United States takes issue with this exhibit on several grounds. As a preliminary matter, plaintiff asserts that it is claimant's own responsibility to furnish an English translation of Exhibit A if he wishes it to be considered. This principle finds substantial support in various case authorities, albeit in other legal contexts. After all, "[i]t is clear, to the point of perfect transparency, that federal court proceedings must be conducted in English." *United States v. Rivera–Rosario*, 300 F.3d 1, 5, 7 n. 4 (1st Cir.2002) (noting "well-settled rule that parties are required to translate all foreign language documents into English"); *see also Lopez–Carrasquillo v. Rubianes*, 230 F.3d 409, 413–14 (1st Cir.2000) (declining to consider as part of summary judgment record a deposition excerpt in Spanish, where party submitting excerpt failed to provide English translation); *Krasnopivtsev v. Ashcroft*, 382 F.3d 832, 838 (8th Cir.2004) (copy of passport was properly excluded from evidence where no English translation or certification was offered); *United States v. Cruz*, 765 F.2d 1020, 1023 (11th Cir.1985) (where defendant engages in "deliberate tactical decision" not to submit English translation of Spanish tape, he cannot complain on appeal that jury's function was usurped when he failed to present evidence that would have aided jury in fulfilling that function); *Heary Bros. Lightning Protection Co. v. Lightning Protection Institute*, 287 F.Supp.2d 1038, 1074 (D.Ariz. 2003) (*sua sponte* striking as inadmissible plaintiffs' exhibits that were not in English and for which plaintiff had provided no translation); *Continental·Illinois Corp. v. C.I.R.*, 1989 WL 99426, 57 T.C.M. (CCH) 1464 (U.S. Tax Ct.1989) (declining to make untranslated financial documents part of record where neither respondent nor court is literate in language in which statements were written).[14] The Court concurs with the reasoning of these authorities. If Aguila, as a claimant in a civil forfeiture action proceeding with retained counsel, wished for the Court to consider Exhibit A, it was incumbent on him to provide a certified translation. This he has not done, nor has he offered any explanation for his failure to do so. It is not the responsibility of this Court to remedy Aguila's failure to transform Exhibit A into a comprehensible exhibit in an English-language court. As such, Exhibit A may properly be excluded from consideration here.

Even if Aguila's failure to provide a certified translation were not fatal to the admissibility of Exhibit A, that document would fail several basic evidentiary thresholds. No declarant is identified on the document's face. It is unsigned, unsworn, unverified and unauthenticated. Claimant has failed to identify any basis on which it would be admissible as an exception to the hearsay rule found at Rule 802, Fed. R.Evid. Moreover, plaintiff correctly observes that to the extent Aguila seeks to admit Exhibit A pursuant to Rule 902(12), as a certified foreign record of regularly conducted activity, Aguila has ignored baseline equitable requirements of that rule, namely: (i) that plaintiff be given advance written notice of his intent to rely

---

14. Notwithstanding these precedents, the Court recognizes that some courts have allowed foreign-language documents into evidence, even without accompanying translations. *See Jazz Photo Corp. v. United States*, 353 F.Supp.2d 1327, 1361–61 (CIT 2004) ("That some of the documents contained within the business records are written in a foreign language or not produced upon company letterhead does not defeat admissibility but instead affects only the probative value of such documents ....").

on that document, and (ii) that claimant make such document available sufficiently in advance to provide plaintiff with a fair opportunity to challenge it.

In light of these infirmities, it is the opinion of this Court that the United States' Motion to Strike (doc. 33) this Spanish-language Exhibit A to claimant's response is due to be, and the same hereby is, **granted**. The document captioned "Historia Clinica Psicologica" and appended to claimant's brief as Exhibit A is hereby **stricken** as an untranslated Spanish text that would not otherwise pass muster under rudimentary evidentiary standards even if it had been presented in translated form.

■ Because the Court will not consider Exhibit A, it is left with Aguila's counsel's unsupported representations that his claim should not be disqualified because "Claimant claims he has a nervous condition that has prevented his return to the United States." (Aguila Brief, at 2.) This undocumented "nervous condition" does not appear to affect Aguila's ability to travel, as he drove substantial distances in the Unit-ed States in November 2003 prior to seizure of the Truck.[15] There being no evidence that Aguila has been involuntarily restrained from traveling to this judicial district to defend the criminal charges against him, his purported nervous condition does not persuade this Court to exercise its discretion in favor of allowing his claim in the civil forfeiture action pursuant to § 2466.[16]

2. *Alleged Weakness of Admissible Evidence Against Claimant.*

■ As a secondary basis for requesting that the Court stay its hand and not disallow his claim, Aguila urges the Court to consider "the relative weakness of the Plaintiff's admissible evidence against him." (Claimant Brief, at 3.) Although claimant does not explain this conclusory remark, he appears to be relying on the following contentions: (1) law enforcement officers apparently failed to record any statement that Aguila might have provided on the date of the seizure; (2) officers apparently failed to secure a written *Miranda* waiver from Aguila; and (3) there is no evidence that the narcotics dog, Dixie,

---

15. More recently, correspondence from Aguila's counsel to plaintiff confirms that as recently as October 2004 Aguila has been temporarily "out of town" and therefore unable to respond to plaintiff's request to take his deposition. (Plaintiff Brief, at Exh. E–2.) Aguila has not contended, and on this record cannot seriously argue, that he is unable to travel to this judicial district because of medical restrictions.

16. Informal review of Exhibit A by a Spanish speaker reinforces this determination. The Court's understanding of Exhibit A is that the unidentified declarant has diagnosed Aguila as being generally in good health, but suffering from recurring anxiety and fear that he may be unjustly accused, convicted or threatened. It appears that such anxiety manifests itself in the form of nightmares, insomnia, urinary incontinence, and nervous tics in his right eye. Thus, if the Court understands Exhibit A correctly, Aguila is contending that he must remain in Mexico, hiding from criminal charges in the United States, because he suffers from a nervous condition triggered by those charges and his accompanying fear of being convicted. Such a showing falls well short of justifying his refusal to submit to federal jurisdiction. If this Court excused from appearing at criminal proceedings every defendant who harbored anxiety about pending federal charges, precious few criminal defendants would ever appear in this courthouse. Besides, the medical conclusions appear suspect, at best, inasmuch as page 4 of Exhibit A reflects that the unknown declarant's assessment of Aguila's condition is based, at least in part, on a narrative of the November 2003 incident that radically diverges from anything supported by the record in this case or alluded to by Aguila's counsel's arguments to date. Thus, even if Exhibit A were considered, it does not justify Aguila's absence or warrant allowing his claim.

who alerted to the area of the Truck where the currency was hidden, has been trained to distinguish between ordinary circulated currency (which may contain narcotics residue even in the absence of unlawful activity) and currency used in drug trafficking. (*Id.* at 3–5.)

The Court would expect Aguila to make all of these arguments in defense of the criminal charges against him. However, that the United States' case against Aguila may not be ironclad does not necessarily yield a conclusion that the United States' evidence is "relatively weak." Let us remember that Aguila was stopped in this judicial district driving a vehicle with a Mexican license plate that held more than $300,000 in U.S. currency secreted in hidden compartments. This vast quantity of currency consisted of more than 12,000 bills (in denominations of between $1 and $20) bound by rubber bands, vacuum-sealed and wrapped in foil. The record includes affidavits from law enforcement officers declaring, based on personal knowledge, that Aguila verbally waived his *Miranda* rights and stated that he was being paid $4,000 to transport what he believed was narcotics or other contraband to Mexico, but that he did not know there was money in the Truck until the officers discovered it earlier that day. Such affidavits also reflect that Aguila later told an officer (in the context of discussion about a confidential informant program) that he feared for his family's safety in Mexico because the people whose money he had lost were upset with him.[17]

Whatever flaws and imperfections it may (or may not) have, this evidence cannot reasonably said to amount to a weak case of civil forfeiture against Aguila under the Controlled Substances Act and the Bulk Cash Smuggling Act. The sheer volume of cash found in the Truck is highly probative circumstantial evidence of a link to illegal drug activity. *See United States v. $22,991.00, more or less, in U.S. Currency,* 227 F.Supp.2d 1220 (S.D.Ala.2002) (unusually large amount of cash in trunk of automobile is "highly probative, although not dispositive, circumstantial evidence of a link between this exorbitant amount of cash and illegal drug activity"); *United States v. $121,100.00 in U.S. Currency,* 999 F.2d 1503, 1507 (11th Cir.1993) (characterizing quantity of cash seized as "highly probative of a connection to some illegal activity"). This fact, coupled with affidavit testimony that drug couriers often package and conceal drug proceeds in the manner that the currency in Aguila's truck was hidden, as well as the drug dog's positive alert to the presence of narcotics, the officers' testimony about Aguila's incriminating statements, and Aguila's apparently shifting explanations for the Currency, creates a substantial case for civil forfeiture under the Controlled Substances Act.[18]

---

17. In response, Aguila has insisted that he acquired the seized property through his own hard work, but has proffered no evidence that he came by the $300,000+ in currency by legitimate and lawful means. Aguila has also identified potentially fruitful avenues for cross-examination of Government witnesses, but the availability of such trial tactics does not justify a conclusion that the United States' evidence in support of civil forfeiture is "relatively weak."

18. The argument in favor of civil forfeiture under the Bulk Cash Smuggling Act may be even more compelling. If the Court understands Aguila's position properly, he contends that he brought the truck, laden with several hundred thousand dollars in concealed U.S. currency in small bills, across the Mexico–U.S. border more than a week prior to its seizure. There is no evidence that Aguila ever reported such a massive quantity of cash to U.S. officials before bringing it across the border, as required by the currency reporting requirements of 33 U.S.C. § 5316. Indeed, Aguila's having concealed the currency in secret compartments is compelling evidence that he "with the intent to evade a currency

Besides, even if Aguila were correct that the case against him is relatively weak, this point would not militate in favor of the Court allowing his claim and declining to apply the fugitive disentitlement provisions of CAFTA. Surely, the prospect of a weak federal case would provide Aguila with all the more incentive to return to the United States to clear his name and vindicate his purported property rights as to the *in rem* defendants. *See, e.g., $1,231,349.68*, 227 F.Supp.2d at 133 ("If it truly is his intent to defend himself against the charges in the indictment and to contest the forfeiture action, he has one clear option—return to the United States."). The Court will not exercise its discretion in favor of allowing Aguila to malign the Government's case in the civil forfeiture action from afar even as he thumbs his nose at this Court's jurisdiction over the pending criminal proceedings against him.

### 3. The Court's May 2004 Order.

■ Finally, Aguila urges the Court not to disallow his claim because of the Court's own findings in its Order (doc. 9) dated May 17, 2004 that there was no reason why this civil forfeiture action could not proceed without Aguila's presence. (Claimant Brief, at 3.) In that Order, the Court denied Aguila's request to have this Court order the Departments of State and Homeland Security to allow Aguila to reenter the United States to participate in the forfeiture action. As grounds for this ruling, the Court reasoned, in part, that:

requirement under section 5316, knowingly conceal[ed] more than $10,000 in currency" in the truck, in violation of the Bulk Cash Smuggling Act, 31 U.S.C. § 5332(a)(1). Such a violation would in turn subject the cash and the vehicle to the civil forfeiture provisions of that Act, under § 5332(c)(1)-(3). Under the circumstances, Aguila's contention that the forfeiture evidence against him suffers from "relative weakness" is contrary to the clear weight of the evidence in the record at this time.

"Aguila's counsel offers no explanation for why his client's physical presence in the United States will facilitate preparation of his claim or the conduct of the hearing. There is no obvious inherent reason why a civil claimant cannot provide meaningful assistance in preparing a claim from afar, or why his attorney's presence at hearings would be inadequate to safeguard his rights."

(May 17, 2004 Order, at 3.)

However, the landscape has changed considerably since the May 17 Order. In particular, the criminal indictment against Aguila has been unsealed and he has become aware of both the indictment and the outstanding warrant for his arrest. In May 2004, Aguila was not a fugitive from justice. Today, and for the last three months since he learned about the indictment and warrant, he is.[19]

More fundamentally, Aguila's argument misses the point. The issue is not whether this civil forfeiture action could ostensibly proceed without his physical presence in the United States. As the Court observed in May, it could. Rather, the issue today is whether Aguila should be permitted to avail himself of the jurisdiction of this Court to reclaim property that he claims belongs to him even as he disrespects the jurisdiction of this Court to institute criminal proceedings against him based on his alleged criminal activities involving that very property. *See United States v. All Right, Title and Interest in Real Property*

19. The other critical circumstance to have changed since May 2004 is that the record reflects that the United States returned Aguila's visa to him in August 2004. Thus, unlike in May 2004, Aguila now possesses his passport and visa, and could readily reenter the United States if he desired to do so, without the need for special judicial intervention with the Departments of State or Homeland Security.

*and Appurtenances Located at Trump World Towers,* 2004 WL 1933559, \*2 (S.D.N.Y. Aug. 31, 2004) ("But a claimant may not use the resources of a federal court for personal benefit while knowingly evading the jurisdiction of the same court to avoid criminal prosecution, and courts are given express statutory authority to dismiss civil forfeiture claims related to criminal cases when the claimant is a fugitive from justice."). In short, nothing in the May 17, 2004 Order counsels against application of the fugitive disentitlement doctrine to bar Aguila's claim.

### III. Conclusion.

This case presents a scenario in which Aguila seeks to use the resources of this Court to pursue a civil forfeiture claim while simultaneously evading jurisdiction to avoid sanction in a related, pending criminal case. Aguila is a fugitive from justice who has demonstrated disrespect for the legal process, such that he has no right to call upon this Court to adjudicate his claim. Having found that the five CAFTA prerequisites to application of the fugitive disentitlement doctrine in the civil forfeiture context are present, and having determined that disallowing Aguila's claim is necessary to protect the integrity of the judicial process from abuse, the Court relies in its discretion on 28 U.S.C. § 2466 to dismiss Aguila's claim to the *in rem* property that is the subject of this action. In

the opinion of the undersigned, "[t]his is precisely the type of situation that Congress intended to address when it enacted the Civil Asset Forfeiture Reform Act of 2000." *United States v. $1,231,349.68 In Funds,* 227 F.Supp.2d 130, 133 (D.D.C. 2002).[20]

For all of the foregoing reasons, it is hereby **ordered** that the United States' Motion to Strike Claim (doc. 26) is due to be, and the same hereby is, **granted.** Claimant Jose Luis Verdin Aguila's claim to the *in rem* property that is the subject of this forfeiture action is hereby **stricken and dismissed with prejudice** pursuant to 28 U.S.C. § 2466. No other claimants having come forward with regard to the *in rem* defendants, judgment will be entered in favor of the United States. Additionally, the United States' Motion to Strike (doc. 33) Exhibit A to the Claimant's Brief is **granted,** and such exhibit is hereby **stricken.**

---

**20.** In so concluding, the Court notes that Aguila does not offer any viable alternatives to striking his claim. Pursuant to the applicable Rule 16(b) Scheduling Order (doc. 20), the discovery deadline for this action passed on November 30, 2004, and the dispositive motions deadline expired on December 13, 2004. Despite its efforts to depose Aguila beginning in October 2004, plaintiff has been unable to secure basic discovery from Aguila regarding the factual basis of his claim in this civil forfeiture action. Nor is there any indication that Aguila intends to appear for a deposition in the foreseeable future or to abide by the Federal Rules of Civil Procedure and the rules of this District Court in conducting discovery and litigating his claim. Although Aguila insists that genuine issues of material fact render it inappropriate to dismiss his claim, the United States cannot reasonably be expected to proceed to trial on the civil forfeiture claim in May 2005 without discovery of the basis for Aguila's claim, nor will the Court revamp the discovery schedule to accommodate a claimant who has demonstrated unwillingness to submit to the jurisdiction of this Court or to be bound by the relevant procedural rules.